Fletcher L. THOMPSON d/b/a Fletcher L. Thompson Realty; Empire Real Estate Board, Inc., Plaintiffs–Appellants,

v.

METROPOLITAN MULTI–LIST, INC., d/b/a Metro Listing Service; DeKalb Board of Realtors, Inc., Defendants–Appellees,

Wendell White d/b/a Empire Realty Co. and E. Pearl Presley d/b/a Pal Realty Co., Intervenors–Plaintiffs.

No. 90–8724.

United States Court of Appeals, Eleventh Circuit.

July 11, 1991.

---

**66.** Lanham Act § 38, 15 U.S.C. § 1120 (1988).    **67.** Fed.R.App.P.

William E. Sumner, Sumner & Hewes, David A. Webster, Robert A. Burroughs, Atlanta, Ga., for plaintiffs-appellants.

Brian P. Turcott, Hurt, Richardson, Garner, Todd & Cadenhead, Stephen E. O'Day, Atlanta, Ga., for Metropolitan.

Charles M. Goetz, Jr., Norton, Pennington, Goetz & Conkright, George Geeslin, Atlanta, Ga., for DeKalb Bd. of Realtors.

Before JOHNSON and COX, Circuit Judges, and GODBOLD, Senior Circuit Judge.

JOHNSON, Circuit Judge:

This case arises on appeal following the district court's grant of summary judgment in favor of the defendants in this antitrust action.

## I. STATEMENT OF THE CASE

### A. *Background Facts*

Metropolitan Multi–List, Inc. ("Metro"), one of the defendants-appellees, is a wholly-owned subsidiary of the DeKalb Board of Realtors. Metro is a computerized mul-

tilist real estate listing system. A multilist system is a cooperative venture which is used by real estate brokers from various real estate firms who place into the system a list of all the houses that they are attempting to sell. Brokers representing potential buyers look for houses through the multilist, and in the event of a sale they split the resulting commission with the selling broker. Brokers consider the use of a multilist system a necessity.

Metro provides the only multilist service which covers all of Atlanta. While First Multiple competes with Metro on the north side of Atlanta, there is little or no competition on the south side of Atlanta. On the south side of Atlanta, Metro carries the vast majority of listings and is utilized in most of the completed sales, measured both in dollar amounts and in raw numbers. Also, the vast majority of real estate brokers active in the area are members of Metro.

In order to use the Metro multilisting service a broker must become a Realtor. A Realtor is a broker (or a sales associate) who belongs to one of the local branches of the National Association of Realtors. Metro was an independent listing service until the DeKalb Board of Realtors acquired Metro and imposed the Realtor membership requirement upon those who would like to use the listing service.

There are four parties to this dispute. The two defendants are Metro and the DeKalb Board of Realtors; the two plaintiffs are Fletcher Thompson and the Empire Real Estate Board. Fletcher Thompson is a real estate broker who owns his own brokerage firm on the south side of Atlanta. He does not wish to join the Atlanta Board of Realtors.[1] He applied to use the Metro listing service but his application was denied solely because of his failure to join the Realtors. The defendants admit that when he joins the Realtors he will be allowed to use the listing service. The

Empire Board was founded in 1939 as an African American professional association because, at that time, the Realtors excluded African Americans from membership. The Empire Board competes with the Board of Realtors and offers similar services, including a code of ethics and arbitration. The Empire Board is a predominantly African American association which services a predominantly African American clientele. Most of its members are located on the south side of Atlanta and most of its members traditionally represent buyers. The Empire Board alleges that, because of Metro's requirement that its members also belong to the Realtors, Empire is losing members. Some firms that otherwise would join the Empire Board cannot afford membership with both the Realtors and the Empire Board.

### B. *Procedural History*

Plaintiffs filed their complaint on December 22, 1988, alleging antitrust and Fair Housing Act violations. Wendell White and others moved to intervene in this action, but the motion was denied. Following discovery, the parties filed cross motions for summary judgment. The district court granted defendants' summary judgment motion. The plaintiffs brought this timely appeal of the district court's dismissal of the antitrust claims.[2]

## II.  ANALYSIS

A district court's order granting summary judgment is subject to de novo review by this Court. *See Shipes v. Hanover Ins. Co.*, 884 F.2d 1357 (11th Cir.1989).

### A. *Standing*

The question at the heart of standing analysis is whether the particular litigant before the court is entitled to have the court adjudicate the particular claim presented. *See Warth v. Seldin*, 422 U.S.

---

1.  While Metro is owned by the DeKalb Board of Realtors, Thompson and most of the members of the Empire Real Estate Board would be under the jurisdiction of the Atlanta Board of Realtors if they joined the Realtors.

2.  Because the plaintiffs have not specifically appealed the district court's disposition of the Fair Housing Act claims, the plaintiffs have waived any objection to summary judgment on this issue.

490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). There are two plaintiffs to this action: Empire and Thompson; there are basically three different antitrust claims alleged: an illegal tying arrangement; a conspiracy to monopolize a market; and an illegal group boycott.

### 1. Empire's Standing to Litigate the Three Claims

■ Empire is an unincorporated association. As such, it has standing to allege certain injuries suffered directly by the organization, *see id.* at 511, 95 S.Ct. at 2211, and standing to bring certain claims on behalf of its members. *See id.*

Empire has standing to directly bring the tying claim. We have recently held that an antitrust standing analysis involves a two-pronged inquiry into whether the plaintiff has suffered an antitrust injury and whether the plaintiff is an efficient enforcer of the antitrust laws. *See Todorov v. DCH Healthcare Authority*, 921 F.2d 1438 (11th Cir.1991). The "antitrust injury" is satisfied when the plaintiff "plead[s] and prove[s] that the injury [it has] suffered derives from some anticompetitive conduct and is the type of injury the antitrust laws were intended to prevent." *Id.* at 1450. Empire competes in the market for professional affiliation with the Realtors. Empire claims that it has lost members because the Realtors have entered an illegal tying arrangement with Metro which forces Empire members to drop their affiliation with Empire and join the Realtors. Assuming that Empire can prove these allegations, it has alleged a valid antitrust claim. *See* Section II C, *infra.* Empire is also an efficient enforcer of the antitrust laws because the alleged injury is neither speculative nor indirect. *Todorov*, 921 F.2d at 1451.

■ Empire has standing to bring a suit on behalf of its members for the conspiracy to monopolize the multilist service market claim. The courts apply slightly different tests to examine when an organization has standing to bring a claim directly and when the organization has standing to bring the claim on behalf of its members. Empire may bring a suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*United Auto Workers v. Brock*, 477 U.S. 274, 282, 106 S.Ct. 2523, 2529, 91 L.Ed.2d 228 (1986). First, Empire's members could bring a suit in their own right for the conspiracy to monopolize the multilist market claim. There is evidence in the record supporting Empire's assertion that nearly 40% of Empire's members also belong to the Realtors and use Metro. It is beyond dispute that, as consumers of the multilisting service, the Empire members may bring an action alleging antitrust violations which force them to pay excessive fees. *See Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 530, 103 S.Ct. 897, 904, 74 L.Ed.2d 723 (1982). Empire is asking for injunctive relief including a request that the court order Metro to eliminate its membership requirements and lower its fees. Both of these requests could be brought by an individual Empire member. Second, the suit is germane to the organization's purpose since Empire is a professional organization which strives to help its members perform as brokers. *Cf. United Auto Workers v. Brock*, 477 U.S. at 286–87, 106 S.Ct. at 2530–31 (discussing the U.A.W.'s purpose). Third, Empire is not seeking monetary damages but only injunctive relief; therefore as the Court noted in *U.A.W. v. Brock*, the association does not need the participation of its members to bring the suit. *Id.* at 287, 106 S.Ct. at 2531.

Empire also has standing to bring a suit on behalf of its members for the group boycott claim. Empire's members could bring a suit in their own right for the group boycott claim. There is evidence in the record that other members of Empire, including Thompson, would like to use Metro's multilist service but are ineligible be-

cause of the alleged group boycott. And Empire is asking for injunctive relief that is germane to the organization's purpose and could be brought by the association without the participation of the members.

### 2. Thompson's Standing to Litigate the Three Claims

Thompson has standing to litigate the tying claim and the group boycott claim. Thompson applied to use Metro's multilist service but his application was denied because he refused to purchase the tied product, membership in the Realtors. Our circuit has recognized, in a related context, that an attempt to enter a market coupled with a showing of preparedness is sufficient to establish an injury in fact, which is one of the bases of standing. *See Martin v. Phillips Petroleum Co.*, 365 F.2d 629, 633 (5th Cir.1966). Therefore, in cases such as Thompson's, a defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a consumer of its product. As long as the plaintiff made a reasonable attempt to enter the market, our Circuit's case law recognizes that the plaintiff has standing to contest antitrust violations which create barriers to that market. Therefore, Thompson can litigate the validity of the entry barriers which prevented his use of the multilist service. These entry barriers constitute the bases of the tying claim and the group boycott claim. Moreover, the injuries which stem from Metro's ability to prevent Thompson from becoming a multilist service user are antitrust injuries and Thompson would be an efficient enforcer of the antitrust laws because the injuries are suffered directly.

Thompson, however, lacks standing to litigate the conspiracy to monopolize claim. The plaintiffs allege that Metro has conspired to monopolize the multilist market for the southside of Atlanta. The plaintiffs further contend that this alleged monopoly allows Metro to raise its prices and force Metro's users to join the Realtors.[3] The bulk of the antitrust violations from these actions are covered by the tying claim and the group boycott claim, and thus Thompson has standing to challenge them as tying or boycott claims. However, the high user fees are actionable as an entry barrier under the group boycott theory and under the conspiracy to monopolize theory. While Thompson has standing to challenge them to the extent that they constitute an entry barrier, Thompson is presently not a user of Metro and has not been directly affected by the high fees. Therefore, he lacks standing to bring this claim.

### B. *The Relevant Market*

On a very simplistic level, antitrust law is concerned with abuses of power by private actors in the marketplace. Therefore, before we can reach the larger question of whether Metro violated any of the antitrust laws, we must confront the threshold problem of defining the relevant market. Markets are defined in terms of two separate dimensions: products and geography. Once we have defined the relevant market, we can examine Metro's position within the market, determine Metro's "market power," and thereafter determine whether Metro had enough power within the marketplace to abuse its position.

It is undisputed that the relevant product market is the market for multilist services.[4] The parties, however, strongly dispute the geographic boundaries of that market. The plaintiffs argue that the relevant geographic market is the south side of Atlanta. The defendants argue that the relevant geographic market constitutes all of Atlanta. The district court ruled in favor of the defendants, stating that "[t]he relevant

---

**3.** It is important to recognize that Thompson and Empire are not alleging that they are either *actual competitors or potential competitors* in the market for multilist services. Therefore, they are not alleging that Metro has harmed them by excluding them from the market. They are alleging harm because Metro has raised its

prices and because Metro forces its users to join the Realtors.

**4.** As will be discussed below, *see* section II C 1, *infra,* the parties do dispute whether there is a second product market, the market for professional affiliation.

geographic market is not limited to the southside of Atlanta but encompasses the area of effective competition within which the defendants operate [which includes all of Atlanta.]"

The Supreme Court in *United States v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), explained that the concept of a geographic market is essentially an economic concept in which the courts should examine "supplier-customer relations." *Id.* at 357, 83 S.Ct. at 1738. The goal is to determine how economic actors function in terms of where buyers seek supplies and sellers seek purchasers. By examining transportation and other transaction costs as well as buyer preferences, it is possible to determine if a given area should be viewed as a single market. *Id.* at 358, 83 S.Ct. at 1738. As the Court noted, " 'the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies.'* " *Id.* at 359, 83 S.Ct. at 1739 (emphasis in original) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961)). Courts, when they are defining the contours of a given market, should try to recall that the purpose of this task is to enable the courts to define market power. Thus we are required to exclude irrelevant information about purchasers and sellers who are not part of a market. By erroneously including potential sellers in a market when, in fact, those sellers are not members of that market, a court dilutes the defendant's role in the market and thereby risks erring in its ultimate determination of whether there has been an antitrust violation.

Viewed in light of *Philadelphia National Bank*, the district court's elliptical determination of the geographic market is less than satisfying. The district court's opinion states its conclusion as to the relevant geographic market without explaining how it reached this conclusion. It appears that the district court merely accepted the area in which Metro operates as the relevant geographic market without considering the nature of the "supplier-customer" relationship. The process of defining a geographic market is more difficult when the courts are attempting to define a geographic market for something as intangible as information contained in data banks and conveyed via computers. While it is common to use the term "geographic market" in defining the parameters of a relevant market, it is misleading for courts to confine their analysis solely in geographic terms. The *Philadelphia National Bank* Court focused on the effects of "buyer preferences" as one of several factors which help define the contours of a given market. While transportation costs and the like may be the primary cause of market barriers which help define the parameters of markets in hard commodities such as steel, *see United States v. Columbia Steel Co.*, 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), buyer preferences may be the more important cause of market barriers in intangible markets.[5] In the context of markets which deal in intangibles, the courts should examine transaction costs, transportation costs, and buyer preferences, as *Philadelphia National Bank* commanded, and thereby exclude all those potential sellers, regardless of where they are located, from the analysis of the market when buyers do not "practicably" turn to them for supplies. *Id.*

With this in mind, the district court erred in accepting Atlanta as the relevant geographic market. The parameters of a given market are questions of fact, *see Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560 (11th Cir.1983), and

---

**5.** This case is an example of how the process of defining the parameters of the product markets and the geographic markets can be viewed as somewhat interchangeable. *See* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L. Rev. 937, 981 (1981). We could, for example, refer to the product market as those multilist services specializing in the south Atlanta real estate market or we could define the product market as multilist services and the geographic market as the south side of Atlanta. In the end, it makes little difference how one approaches the problem as long as the end result, the definition of the market, is correct.

therefore summary judgment is inappropriate if there are material differences of fact. On one hand, the defendant came forward with some evidence that Atlanta is a unitary market. But this was rebutted by the plaintiff who placed into the record considerable evidence suggesting that Atlanta is not a homogeneous real estate market and that real estate brokers specialize in different areas of the city. Moreover, the plaintiffs in this action, Empire and Thompson, specialize in real estate located on the south side of Atlanta. Therefore, the plaintiffs "can practicably turn for supplies" only to those multilist services which include south side listings. It is therefore inappropriate to resolve this dispute on a motion for summary judgment.

### C. *The Tying Claim*

■ The plaintiffs claim that Metro and the DeKalb Board of Realtors have been engaging in an unlawful tying arrangement. The plaintiffs allege that Metro's dominance in the market for multilist services allows it to force brokers into accepting the tied product, membership in the Realtors professional association in order to obtain the tying product, use of the multilist service.

Any alleged antitrust violation may be analyzed under either a *per se* rule or a rule of reason. This Court has held that unless the alleged anti-competitive behavior falls within a few narrow classes, the behavior should be analyzed under the rule of reason. *See United States v. Realty Multi–List, Inc.,* 629 F.2d 1351 (5th Cir.1980). While tying arrangements are one of the classic *per se* forms of anti-competitive behavior, *see Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 608–10, 73 S.Ct. 872, 880–81, 97 L.Ed. 1277 (1953), we have recognized that tying claims can also be analyzed under the rule of reason. *See Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407 (11th Cir.1987). This Court has held that, unless the plaintiff is able to show all the elements of a *per se* tying claim, the claim must be analyzed under the rule of reason. *Id.* The four basic elements of a *per se* tying claim are:

1) that there are two separate products, a "tying" product and a "tied" product; 2) that those products are in fact "tied" together—that is, the buyer was forced to buy the tied product to get the tying product; 3) that the seller possesses sufficient economic power in the tying product market to coerce buyer acceptance of the tied product; and 4) involvement of a "not insubstantial" amount of interstate commerce in the market of the tied product.

*Id.* at 1414. This Court in *Keener v. Sizzler Family Steak Houses,* 597 F.2d 453 (5th Cir.1979), added a fifth requirement that the tying company have an economic interest in the tied product.

■ Metro argued before the district court that summary judgment should be granted in its favor on all five elements of the tying claim. The district court granted summary judgment only on the coercion prong and the economic interest prong. Metro renews its argument for summary judgment on each of the elements of the claim in this Court. We therefore must analyze each element of the tying claim to determine if summary judgment was appropriate.

### 1. Two Separate Products or Services

Metro argues that there is only one relevant product, the market for multilist services, and that there are not two separate products. Metro concludes that if there are not two separate products there cannot be any illegal tie between them.

In determining whether there are two separate products, we are guided by *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), which held that two products are separate for tying analysis when there are two separate markets for the product. *Id.* at 21, 104 S.Ct. at 1563. The question of whether a series of transactions or whether a given product constitutes a separate market is a question of fact. *See Graphic Products Distributors, Inc. v. Itek Corp.,* 717 F.2d 1560 (11th Cir.1983). It is undisputed that multilist

services constitute one product market. It is hotly disputed, however, whether there is a second, separate market for professional affiliation. In its analysis, the *Jefferson Parish Hospital* Court examined billing practices, consumer preferences, and the realities of similar markets in its determination that the market for hospitals is separate from the market for anesthesiologists. *Id.* 466 U.S. at 22–23, 104 S.Ct. at 1563–64.

██ Metro's main argument is that multilist services are useless without the support services provided by the Realtors and that therefore the two services are actually one product. Metro argues that because brokers using a multilist service create various agency and subagency arrangements, they would be hesitant to use these services if they had doubts about the ethics of the other brokers. Metro has placed considerable evidence in the record that the Realtors help reduce uncertainty and other transaction costs by providing a code of ethics and mandatory arbitration. Therefore, according to Metro, brokers utilizing the multilist service have less hesitancy because they know that should another broker use the multilist service unethically and "steal" a sale or a customer the Realtors will efficiently adjudicate the injured broker's complaint. Metro further states that it essentially had a choice and could have structured its operations so that the code of ethics, arbitration, and other support services could have been either a direct part of the multilist service or an indirect part through the Realtors. Metro complains that it should not be penalized for structuring its business one way rather than another. However, both of Metro's arguments are irrelevant to the question of whether the market for professional affiliation is separate from the market for multilist services. Metro does not discuss billing practices, consumer preferences, consumer impressions, the cross-elasticity of the markets, or virtually anything relevant to the definition of whether there are separate markets.[6]

██ Metro next argues that there is no market for professional affiliation because an individual who joins the Realtors gains nothing more than a status. Metro's argument can be interpreted in one of two ways. To the extent that Metro is claiming that services are somehow exempt from the antitrust laws, Metro's argument is meritless. *See generally Jefferson Parish Hospital, supra.* On the other hand, if Metro is claiming that the Realtors do not provide services and that by joining the Realtors one merely is gaining a "status," Metro is wrong to think that by calling a "service" a "status" one can actually alter legal relationships. Even if the Realtors offered no services[7] and a broker who joined the Realtors merely gained some added professional status, we would still need to answer the basic question of whether there is a market for this status. If there is not a market for this status, then it is not a separate product.

In the case at hand, all of the relevant evidence submitted on the question of whether there are two separate product markets indicates that the market for professional affiliation is separate from the market for multilist services. For example, there is evidence that the bill for joining the Realtors is separate from Metro's bill; that a broker can join the Realtors and choose not to use the multilist service; that, within Atlanta, there are at least two

---

**6.** Metro raises a second argument which is virtually indistinguishable from the first argument. Metro initially argues that a multilist service would be useless without the support services provided by the Realtors. Metro argues in the alternative that multilist services and the Realtors' other services are in fact one product because they function as one product. Such an argument, if it actually is distinct from the first argument, is nonetheless equally irrelevant to the question of whether the markets are in fact separate. Moreover, the *Jefferson Parish Hospi-* *tal* Court explicitly found that such a functional analysis is irrelevant to the question of whether there are, or are not, separate markets. *Id.* 466 U.S. at 19 n. 30, 104 S.Ct. at 1562 n. 30.

**7.** This assertion may come as a surprise to the members of the Realtors who pay several hundred dollars a year for membership and to the DeKalb Board of Realtors official who, in an interrogatory, listed 27 services provided by the Realtors.

professional groups competing for members; that some local Realtor groups offer multilist services and some do not; that Metro was once an independent organization that was later purchased by the Realtors who imposed the Realtor membership requirement; and that in other markets, multilist services are independent of professional membership, *see* Federal Trade Commission Staff Report, *The Residential Real Estate Brokerage Industry* 116 (1983) (At the time of this report, there were at least 55 multilisting services operating in the United States that were independent of any local Realtor organization). Based on these facts, we conclude that summary judgment in favor of the defendant on this element of the claim would be inappropriate.

### 2. Market Linkage

■ The second step in the tying analysis is to determine if the two products are actually tied together. *Tic–X–Press*, 815 F.2d at 1415. The parties agree that a broker may not use Metro's multilisting service without joining the Realtors. Therefore, there is not any actual dispute over whether the markets are tied.[8]

### 3. Economic Coercion

■ One of the bases of the district court's grant of summary judgment was its conclusion that the plaintiffs failed to produce sufficient evidence that Metro had enough economic power due to its multilisting service to coerce brokers into joining the Realtors. In order to prove the economic coercion prong of the tying analysis, the plaintiffs must prove both that Metro has "sufficient market power," *Tic–X–Press*, 815 F.2d at 1420, within the tying market and that Metro has wielded its market power to force brokers to "buy a product that [they do] not want or would have

preferred to buy elsewhere on other terms." *Id.* at 1416.

The plaintiffs first must prove that Metro has sufficient market power within the relevant product market to coerce brokers into choosing the Realtors as their professional association if Metro so desires. We have already concluded that there is a material question of fact whether the tying market is that portion of multilisting services which contains listings on the south side of Atlanta or that portion of multilisting services which contains listings in Atlanta. Thus, this case needs to be remanded for this initial determination. On remand the district court should then use this definition of the relevant market to determine whether the plaintiffs have proven market power.

Metro argues that regardless of which set of boundaries defines the market, summary judgment is warranted because it lacks the requisite market power. In *Tic–X–Press*, this Court stated that market power "can be sufficient even though the seller does not dominate the market ... Economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes." *Id.* at 1420. The Supreme Court in *U.S. Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*), stated, "the question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *Id.* at 620, 97 S.Ct. at 867. The *Fortner II* Court gave examples of legal barriers (such as patents and copyrights), physical barriers (such as uniquely located land), and economic barriers (such as cost advantages), in the tying market. *Id.* at 621, 97 S.Ct. at 868. The *Tic–X–Press* Court added to this list the example of those sellers who benefit from the insulating effect of substantial entry barriers

---

**8.** The Court in *Tic–X–Press* required the plaintiffs to prove both tying and coercion to satisfy this element and to prove market power and coercion to satisfy the third element of tying analysis. We have chosen to reformulate the test to simplify the analysis. Under this reformulation, plaintiffs must prove that the products were tied and then, for the third element, plaintiffs must prove that the defendants have sufficient market power to coerce buyers. Therefore, a plaintiff must prove coercion only once. This reformulation has no substantive effect other than bringing some analytical clarity to an otherwise murky area.

into the tying product market. *Tic–X–Press*, 815 F.2d at 1420.

The district court held that the plaintiffs have not demonstrated sufficient market power. There are two dimensions to its ruling. First, the district court held that there is no evidence in the record of "the defendant's ability to force brokers to" alter their choice of professional associations. Second, the district court held that Metro has no "cost advantage ... that cannot be duplicated." And, therefore, other groups could start a competing multilist system and challenge the defendant's market power.

Metro claims that it does not have any disproportionate market power because other multilist systems compete with it and brokers can use alternatives to multilist systems. Metro claims that an individual who does not want to join the Realtors but nonetheless wants to use a multilist system could join First Multiple. And Metro claims that brokers could use other methods of determining what properties are for sale. Assuming, however, that the market is defined as those multilist systems with listings on the south side of Atlanta, there is evidence in the record that First Multiple is not a part of that market. While First Multiple may in fact compete with Metro in Cobb County and the north portion of Fulton County, there is evidence in the record that First Multiple has few listings on the south side of Atlanta. As for the south side of Atlanta, the record reflects that Metro has no competition except for an occasional listing by First Multiple. Moreover, there is considerable evidence in the record that multilist services are a necessity for brokers. There are several affidavits and depositions which state that it is difficult to survive as a broker without the use of a multilist service. Finally, there is considerable evidence placed into the record that the multilist market has a very low cross-elasticity. For example, there is evidence that the only alternatives to a multilist system are poor substitutes: plaintiff Thompson spoke at length in his deposition that without a multilist system he spends hours every day driving around taking notes on houses for sale, that this method is costly, extremely inefficient, and not very timely; there is also evidence that a non-computerized multilist system has been attempted by Empire but failed because it was not timely enough and that published magazines also are a poor substitute.

As for the second basis of the district court's holding, Metro claims that the district court was correct that there are no high barriers to entering the multilisting service market. Metro notes that the physical assets can be cheaply purchased. While the plaintiffs agree with Metro that the physical assets of a multilist service can easily be purchased at costs comparable to those initially paid by Metro, the plaintiffs contend that there are other barriers to competition in the multilisting service market. The plaintiffs argue that they have met their burden of production by placing into the record proof that a new multilist service needs to build a substantial number of listings before it can become useful. The plaintiffs argue that Metro has built an insurmountable amount of good will and the plaintiffs point out that an individual attempted to compete with Metro and that for a variety of reasons, including this good will barrier, his effort failed. Under *Tic–X–Press, supra*, such a barrier would be sufficient to establish market power.

In short, there is a material issue of fact as to whether the defendants have the necessary market power. There is evidence in the record suggesting that multilist systems are necessary, that there are few realistic substitutes, that there are entry barriers to the market, and that Metro may not have any competitors.

▮ To satisfy the coercion element of the claim, the plaintiffs need to show that Metro not only has this market power but also has wielded this market power to force brokers to alter their choice of professional associations. Metro denies wielding its market power and contends that there is no evidence in the record supporting this claim. However, it is undisputed that Metro requires brokers to join the Realtors.

There also is evidence in the record stating that the expense of dual membership in trade groups can be prohibitive for some brokers, and that 400 of Empire's prospective and current members did not join Empire or quit Empire because of the prohibitive cost.[9] The record also contains the following affidavits: three affidavits stating that the individuals were members of the Realtors and of Empire and that they wanted to quit the Realtors but could not because Metro was too important to their business; three affidavits from Empire members stating that they would like to use Metro but they could not afford membership both in the Realtors and in Empire; seven affidavits from Realtor members who wanted to quit the Realtors and join Empire but could not afford either to lose their access to Metro or to pay a second set of dues for membership in a professional association; and one affidavit from an Empire member who would like to use Metro, evidently can afford membership in both the Realtors and Empire, but dislikes the Realtors because of their past history of discriminating against African Americans. Under *Tic–X–Press*, it is clear that summary judgment is inappropriate on the question of whether there was any actual coercion. *See Tic–X–Press*, 815 F.2d at 1417 (one example is enough to demonstrate coercion).

### 4. "Not Insubstantial" Effect on Interstate Commerce

■ The plaintiffs also claim that they have demonstrated that the tie had more than an insubstantial effect on interstate commerce. The Supreme Court in *Fortner Enterprises v. United States Steel (Fortner I)*, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969), held that the dollar volume in the tied market (in this case, the market for professional affiliation) affected by the alleged antitrust violation must be more than *"de minimis"* to comply with the "not insubstantial" standard. *Id.* at 501, 89 S.Ct. at 1257. Moreover, the gross dollar amounts need not be compared to the overall market to meet this standard. *Id.* This Court has held that $325.00 is insubstantial, *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486 (11th Cir.1985), and that $10,091.07 is not insubstantial. *Tic–X–Press*, 815 F.2d at 1419.

The question therefore is whether this illegal tie has a "not insubstantial" effect on commerce in the tied market. The plaintiffs claim there is sufficient evidence in the record to support this element of the claim. There is evidence that Empire has lost close to 400 members due to this allegedly illegal tying arrangement.[10] There is also evidence that Empire charges $75.00— 175.00 in annual dues. The loss of just one year's dues from these members results in a loss of between $30,000.00—70,000.00 which is clearly substantial.[11]

### 5. The Economic Interest Question

The district court also granted summary judgment because the plaintiffs failed to show that Metro had an economic interest in the Atlanta Board of Realtors. The Realtors are structured like many organizations; all the local chapters of the Realtors belong to a state organization and each of the state organizations belongs to the national organization. Among the sev-

---

9. Metro dismisses Empire's affidavit about lost members as "conclusory, self-serving and factually unsupported." As for Metro's claim that the affidavit is self-serving, we would be surprised if any party ever submitted an affidavit that was not self-serving. Moreover, this attack on the credibility of the witness is inappropriate during a motion for summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). As for Metro's claim that the affidavit was factually unsupported, the affiant was an officer of Empire who spoke about her personal knowledge of the membership.

10. The plaintiffs also claim that the dollar amounts are substantial because there is support in the record that Thompson and others have lost thousands of dollars in lost sales due to their lack of access to a multilisting service. However this loss is not a loss within the tied market because the tied market is the market for professional affiliation.

11. The plaintiffs could also prove a not insubstantial effect on the tying market by determining how much money the Realtors make from brokers who join the Realtors solely in order to use the multilisting service.

eral local Realtor organizations in the greater Atlanta area are the Atlanta and DeKalb Board of Realtors. While Metro is wholly owned by the DeKalb Board of Realtors, Thompson and most, if not all, of Empire's members are within the jurisdiction of the Atlanta Board of Realtors and would have to join that Realtor association to use Metro.

The economic interest standard has been applied three times in this Circuit. *Midwestern Waffles, Inc. v. Waffle House*, 734 F.2d 705, 712 (11th Cir.1984); *Keener v. Sizzler Family Steak Houses*, 597 F.2d 453 (5th Cir.1979); and *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 377 (5th Cir.1977). In each of these cases, the plaintiffs were franchisees challenging a franchisor's detailed rules specifying which products could be sold at the franchise, and in each of these cases, the franchisor had absolutely no financial interest in the products. The court in *Keener* stated that a tying claim fails when the "company has absolutely no interest in the sales of a third company whose products are favored by the tie-in." *Keener*, 597 F.2d at 456. The plaintiffs imply that we should limit the economic interest prong to franchise cases. Although this standard has been applied only in franchise cases and the need for this rule appears to be best suited to such cases, we do not need to limit this economic interest prong to situations involving franchises,[12] because there is evidence in the record to support a finding that there was a sufficient economic interest.

We cannot say that Metro has "absolutely no interest" in the size of the Atlanta Board of Realtors. Because of the close nature of the relationships between all the Realtor organizations, Metro is benefited and therefore has an interest in having Thompson and the other Empire members join the Atlanta Board of Realtors. While Metro is owned by the DeKalb Board of Realtors, both the DeKalb and the Atlanta Boards belong to the Georgia and National

Boards of Realtors. Moreover, a portion of every dollar paid to the local board is paid to the state and national boards. There is evidence in the record showing that the state and national boards then use the money to perform various services for the local boards. In an interrogatory, the DeKalb Board of Realtors listed nineteen benefits received from the Georgia Association of Realtors and seventeen benefits received from the National Association of Realtors. Moreover, the plaintiffs submitted an affidavit from an individual who attended a Georgia Association of Realtors meeting in which the group voted to send up to $15,000 to the DeKalb board to help in the defense of this action. Therefore, there is sufficient evidence in the record for us to conclude that Metro has something more than "absolutely no interest" in the size of the Atlanta Board of Realtors.

In conclusion, it appears that the plaintiffs have placed into the record sufficient evidence alleging the five prima facie elements of a per se tying violation.

### D. *The Group Boycott Claim*

██ The plaintiffs also complain about the restrictive membership policies adopted by Metro. The plaintiffs complain that Metro's requirement that its members belong to the Realtors violates the antitrust prohibition on group boycotts. Far from writing on a blank slate, we are faced with a considerable body of precedent explaining the group boycott effects of a Georgia-based multilist service's membership requirements. In the comprehensive opinion of *United States v. Realty Multi–List, Inc.*, 629 F.2d 1351 (5th Cir.1980), we noted that multilist services have many pro-competitive effects. Most importantly, multilist services help eliminate imperfections in the marketplace by increasing the availability of information. *Id.* at 1368. As a result of the pro-competitive effects inherent in multilist services, this Court recognized that it could not, as a matter of law, con-

---

**12.** Arguably, though, the economic interest prong has already been implicitly limited to franchise cases since the economic interest prong has been ignored in nonfranchise cases. *See Tic–X–Press, supra.* This prong has also been criticized by other courts. *See Gonzalez v. St. Margaret's House Housing Development Fund Corp.*, 880 F.2d 1514 (2d Cir.1989).

demn the multilist service's membership criteria as a *per se* violation of the antitrust laws. *Id.* at 1369. The plaintiffs do not contest this application of *Realty Multi-List* to the case at hand. Following *Realty Multi-List*, we therefore hold that Metro's membership requirements are not *per se* antitrust violations.

The *Realty Multi-List* court, however, held that the membership requirements for a multilist organization can, under a rule of reason analysis, violate the antitrust laws. The *Realty Multi-List* court noted the significant economic harm that multilist services cause when they exclude brokers from their service. *Id.* at 1370–71. First, the excluded broker's listings will not be distributed as widely as possible, resulting in inefficient sales prices. Second, the exclusion reduces the competition among brokers and could result in less competition for brokerage fees. *Id.; See also* Federal Trade Commission Staff Report, *The Residential Real Estate Brokerage Industry* 151–55 (1983) (finding that discount brokers tend not to be members, for whatever reason, of multilisting services). "Thus, where a broker is excluded from a multiple listing service without an adequate justification in the competitive needs of the service, both the broker and the public are clearly harmed. [I]n these circumstances, the exclusion from the association will be found to violate Section 1 [of the Sherman Act]." *Realty Multi-List*, 629 F.2d at 1371 (emphasis added). Therefore, in order to determine whether summary judgment was warranted we must first determine whether Metro has the requisite market power, and second we must examine whether Metro has any justification in terms of fostering competitiveness for its entry requirements.

### 1. Market Power

■ The district court granted summary judgment on the threshold question of market power. The district court noted that *Realty Multi-List* required an initial determination of whether the service has sufficient market power to justify this heightened scrutiny of its membership requirements. The rationale adopted by *Re-*

*alty Multi-List* was that powerful market forces, essential to the economic survival of a competitor, must be open to all competitors. The question of market power is a factual one. *Id.* at 1373. In *Realty Multi-List*, we defined market power as a question of whether the multilist service has " 'sufficient economic importance that exclusion results in the denial of the opportunity to compete *effectively* on equal terms.' " *Id.* at 1373 (emphasis in the original) (quoting Austin, *Real Estate Boards and Multiple Listing Systems as Restraints of Trade*, 70 Colum.L.Rev. 1325, 1346 (1970)). Market power turns on the number of brokers who use the service, the total dollar amount of annual listings, and a comparison of the rate of sales using the multilisting service to the market as a whole. *Realty Multi-List*, 629 F.2d at 1373–74. It is important to note that the Court in *Realty Multi-List* assumed that testimony stating that the multilist system was used by the vast majority of brokers in the relevant geographic market and that it was very important to the economic survival of a brokerage was sufficient to constitute the requisite market power. *Id.* at 1374.

■ In the case at bar, the district court erroneously granted summary judgment on the market power issue. The court first erred by defining the relevant market as all of Atlanta when, at the very least, there is a material difference of fact as to whether some smaller geographic unit is the relevant market. The district court also erred in requiring the plaintiffs to produce exact percentages showing Metro's position in the market. Our case law has never required the showing of exact percentages, especially when both sides concede that such percentages do not exist. Finally, summary judgment is inappropriate because there is a question of material fact as to the existence of market power. On the one hand, Metro claims that it does not have sufficient market power to raise any antitrust concerns. On the other hand, the plaintiffs put into evidence testimony about the dominating role of Metro on the south side of Atlanta, testimony that Metro

has no effective competition on the south side, and evidence of the large number of listings and sales that have utilized Metro. In short, there is sufficient contradictory evidence that summary judgment is inappropriate on this issue.

### 2. The Membership Requirements

■ Metro argued to the district court, and renewed its argument in this Court, that it should be awarded summary judgment because even if it has sufficient market power its membership requirements are acceptable under *Realty Multi–List.* The district court did not reach this argument because of its disposition of the market power question. Because this is a pure question of law and because this argument is properly before this Court, we turn to the question of whether the membership requirements are acceptable under *Realty Multi–List. Id.* at 1383 n. 67 (reaching the issue of whether the membership requirements were reasonable despite the need to remand the case for a determination of market power).

■ The *Realty Multi–List* court held that, once the plaintiffs have shown the requisite market power, the multilist service must justify its restrictive membership requirements. The court noted that the restrictive membership requirements must be evaluated in light of an existing, extensive series of state laws and regulations. The court held that it is necessary to compare the proffered justification of the membership requirements to the state laws and if the multilist service's concern which motivated the restrictive membership requirements is already covered by state real estate brokerage law then the multilist service must "make a showing either that the legitimate needs of the service require protection in excess of that provided by the state or that the state does not adequately enforce its own regulations." *Id.* at 1380. The burden of proof is on the multilist service. *Id.* at 1380–81 n. 61. In the event that the concern underlying the membership requirements is a subject not covered by the regulations or the regulations are not enforced by the state, the court held

that we must evaluate the suggested justification to see if it is "reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end." *Id.* at 1375.

Metro proffers two main justifications for requiring its users to join the Realtors. First, Metro explains that Article 21 of the Realtor code of ethics imposes a "no soliciting" rule. Metro explains that few brokers would be willing to enter his or her client list into Metro's system without assurances that other brokers will not "steal" the list and solicit the clients directly. Metro explains that this justification is pro-competitive because the rule encourages more brokers to use the system and therefore increases the efficiencies of the market. Second, Metro explains that Article 14 of the Realtor code of ethics requires Realtors to arbitrate all disputes. Metro explains that this also encourages brokers to use the system because most disputes are over relatively small sums of money and traditional legal remedies are not cost effective for these disputes.

We therefore must examine the Realtor membership requirement in light of these two justifications and the *Realty Multi–List* standards. It is clear that Georgia state law does not impose any arbitration requirement in potential realtor disputes, *see generally* Ga.Code Ann. §§ 43–40–1 through 43–40–32 (1988 & Supp.1990), or any "no solicitation" rule. *Id.; cf.* Ga.Code Ann. § 43–40–25(a)(26) (Supp.1990) (making it an unfair trade practice to knowingly solicit an exclusive listing from an owner who has already entered an exclusive listing contract with another broker.) Moreover, *Realty Multi–List* held that there is a legitimate competitive justification for a multilist system to adopt a membership rule which is designed to assure the membership of the ethics of the other members and thereby induce individuals to join the system. *Realty Multi–List,* 629 F.2d at 1375. Therefore, the question we must address is whether the realtor membership requirements are "reasonably necessary to the accomplishment of the legitimate goals and narrowly tailored to that end." *Id.* at 1375. While the goal of inducing brokers

to join the multilist system is a legitimate pro-competitive justification and the "no-solicitation" and arbitration rules are both reasonable and narrowly tailored to that end, this lawsuit is not questioning the validity of those two rules. The question before this Court is whether it is necessary to impose Realtor membership requirements in order to obtain the same ends. It is clear that the Realtor membership requirements are not narrowly tailored to the goal of inducing brokers to join the multilist system. Metro could easily impose its own "no solicitation" and arbitration rules on its members. Such rules would not constitute a group boycott and would achieve the same ends that Metro claims the Realtor membership requirements achieve.

Therefore, on remand, it is necessary to determine whether Metro has sufficient market power under *Realty Multi–List.* In the event that the district court finds that Metro has the market power, it must find that the Realtor membership requirements are an illegal group boycott.[13]

### E. *The Conspiracy to Monopolize Claim*

■■■ Finally, the plaintiffs bring a conspiracy claim under section 2 of the Sherman act. *See* 15 U.S.C.A. § 2 (1973).[14] There are three elements to a section 2 claim. The plaintiffs must prove: first, the existence of "concerted action by knowing participants," *Key Enterprises of Delaware v. Venice Hospital,* 919 F.2d 1550 (11th Cir.1990); second, a specific intent to monopolize, *id.;* and third, an overt act. *Id.*

■■■ The plaintiffs argue that the record contains evidence of this conspiracy to monopolize. The plaintiffs allege that Metro was once an independent organization, that the owner of Metro met with important individuals in the National Association of Realtors, that at this meeting the owner of Metro agreed to link with the DeKalb Realtors because such a linkage would help in its competition against First Multiple. From this evidence, the plaintiffs argue that Metro intended to conspire to monopolize the multilisting market. With this monopoly as a base, the plaintiffs argue that Metro attempted to conspire to monopolize the market for professional associations.

The district court assumed that the evidence of the meetings between Metro and the National Association of Realtors was sufficient evidence of the first element, the concerted action element, to survive the summary judgment motion. Metro dismisses the evidence in a one sentence assertion that it is not sufficiently credible and therefore summary judgment should issue. We reject Metro's argument as meritless. Courts do not make credibility judgments when deciding motions for summary judgment. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, the fact that participants at the meeting conceded that they agreed to link up is sufficient to establish concerted action. *See Interstate Circuit v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939).

■■■ Metro next argues that the district court correctly granted summary judgment on the intent to monopolize element of the claim. The record supports the defendants' assertion that the intent of the conspiracy was not anti-competitive because the purpose was to foster competition. Walter Scott, one of the early presidents of Metro, stated that he and the other members of the Metro board of directors decided to merge Metro into the DeKalb Realtors because the Metro board recognized the potential power of a multilist service within the real estate community and the Metro board was afraid that Metro would somehow be purchased by First Mul-

---

**13.** Of course, the Realtors are free on remand to raise other justifications for the realtor membership requirements.

**14.** In their complaint, the plaintiffs also bring a conspiracy claim under section 1 of the Sherman Act. Despite the fact that section 1 claims are usually easier to prove, *see Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs have abandoned their section 1 claims.

tiple. Scott claimed that the board was fearful because First Multiple, at that time, was an exclusive service [15] and the board feared the effect on the real estate community of an exclusive service's purchasing Metro and closing it to the vast majority of brokers. Thus, the Metro board merged itself with the Realtors in order to stay relatively open. The plaintiffs cannot point to anything in the record, nor could we find anything in the record, which suggests any other intent by those at the meeting, and the plaintiffs especially cannot find any anti-competitive intent by those at the meeting. Therefore, there is no material issue of fact appropriate for trial and we affirm the district court's grant of summary judgment to the defendants on this claim as a matter of law.[16]

## III. CONCLUSION

We therefore AFFIRM the district court on its grant of summary judgment in favor of the defendants on the conspiracy to monopolize claim. We REVERSE the district court on its grant of summary judgment in favor of the defendants on the tying claim and the group boycott claim. We REMAND this case to the district court for further proceedings not inconsistent with this opinion.

**15.** Following a Department of Justice lawsuit and a consent decree, First Multiple is now an open service.

**16.** The district court, however, applied an erroneous summary judgment standard. The district court granted summary judgment on the basis that the "plaintiffs have produced no evidence that the defendants specifically intended to ... monopolize [the multilist market.]" The district court however made no specific finding that the defendants first came forward with any evidence suggesting that summary judgment was warranted. As we recently held, "[t]he moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when

that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The district court did not examine whether the moving party had any evidence on the issue of whether Metro had the requisite intent to monopolize. The district court simply, and incorrectly, put the plaintiffs to their burdens of proof.

Rather than return this case to the district court and waste precious judicial resources, we have consulted the briefs and reviewed the record *de novo,* and we find that while the district court utilized the wrong procedure it arrived at the right result.