UNITED STATES STEEL CORP. ET AL. *v.* FORTNER
ENTERPRISES, INC.

No. 75–853.   Argued November 1, 1976—Decided February 22, 1977

*Macdonald Flinn* argued the cause for petitioners. With him on the briefs were *Albert F. Reutlinger, William H. Buchanan,* and *Norman Yoerg, Jr.*

*Kenneth L. Anderson* argued the cause for respondent. With him on the briefs was *A. Scott Hamilton, Jr.*

Mr. JUSTICE STEVENS delivered the opinion of the Court.

In exchange for respondent's promise to purchase prefabricated houses to be erected on land near Louisville, Ky., petitioners agreed to finance the cost of acquiring and developing the land. Difficulties arose while the development was in progress, and respondent (Fortner) commenced this treble-damages action, claiming that the transaction was a tying arrangement forbidden by the Sherman Act. Fortner alleged that competition for prefabricated houses (the tied product) was restrained by petitioners' abuse of power over credit (the tying product). A summary judgment in favor of petitioners was reversed by this Court. *Fortner Enterprises* v. *United States Steel Corp.,* 394 U. S. 495 (*Fortner I*). We held that the agreement affected a "not insubstantial" amount of commerce in the tied product and that Fortner was entitled to an opportunity to prove that petitioners possessed "appreci-

able economic power" in the market for the tying product. The question now presented is whether the record supports the conclusion that petitioners had such power in the credit market.[1]

The conclusion that a violation of § 1 of the Sherman Act [2]

---

[1] As explained at the outset of the opinion, *Fortner I* involved "a variety of questions concerning the proper standards to be applied by a United States district court in passing on a motion for summary judgment in a civil antitrust action." 394 U. S., at 496. Petitioners do not ask us to re-examine *Fortner I*, which left only the economic-power question open on the issue of whether a *per se* violation could be proved. On the other hand, Fortner has not pursued the suggestion in *Fortner I* that it might be able to prove a § 1 violation under the rule-of-reason standard. 394 U. S., at 500. Thus, with respect to § 1, only the economic-power issue is before us.

In *Fortner I,* the Court noted that Fortner also alleged a § 2 violation, namely, that petitioners "conspired together for the purpose of . . . acquiring a monopoly in the market for prefabricated houses." 394 U. S., at 500. The District Court held that a § 2 violation had been proved. Although the Court of Appeals did not reach this issue, a remand is unnecessary. It is clear that neither the District Court's findings of fact nor the record supports the conclusion that § 2 was violated. The District Court found only that "the defendants did combine or conspire to *increase sales* of prefabricated house packages by United States Steel Corporation by the making of loans to numerous builders containing the tie-in provision" and that "the sole purpose of the loan programs of the Credit Corporation was specifically and deliberately to *increase the share of the market* of United States Steel Corporation in prefabricated house packages . . . ." App. 1603 (emphasis added). But "increasing sales" and "increasing market share" are normal business goals, not forbidden by § 2 without other evidence of an intent to monopolize. The evidence in this case does not bridge the gap between the District Court's findings of intent to increase sales and its legal conclusion of conspiracy to monopolize. Moreover, petitioners did not have a large market share or dominant market position. See n. 3, *infra.* No inference of intent to monopolize can be drawn from the fact that a firm with a small market share has engaged in nonpredatory competitive conduct in the hope of increasing sales. Yet as we conclude, *infra,* at 621–622, that is all the record in this case shows.

[2] 26 Stat. 209, as amended, 15 U. S. C. § 1.

had been proved was only reached after two trials. At the first trial following our remand, the District Court directed a verdict in favor of Fortner on the issue of liability, and submitted only the issue of damages to the jury. The jury assessed damages, before trebling, of $93,200. The Court of Appeals reversed the directed verdict and remanded for a new trial on liability. 452 F. 2d 1095 (CA6 1971), cert. denied, 406 U. S. 919. The parties then waived the jury; the trial judge heard additional evidence, and entered extensive findings of fact which were affirmed on appeal. 523 F. 2d 961 (1975). Both courts held that the findings justified the conclusion that petitioners had sufficient economic power in the credit market to make the tying arrangement unlawful.

Before explaining why we disagree with the ultimate conclusion of the courts below, we first describe the tying arrangement and then summarize the findings on the economic-power issue.

I

Only the essential features of the arrangement between the parties need be described. Fortner is a corporation which was activated by an experienced real estate developer for the purpose of buying and improving residential lots. One petitioner, United States Steel Corp., operates a "Home Division" which manufactures and assembles components of prefabricated houses; the second petitioner, the "Credit Corp.," is a wholly owned subsidiary, which provides financing to customers of the Home Division in order to promote sales. Although their common ownership and control make it appropriate to regard the two as a single seller, they sell two separate products—prefabricated houses and credit. The credit extended to Fortner was not merely for the price of the homes. Petitioners agreed to lend Fortner over $2,000,000 in exchange for Fortner's promise to purchase the components of 210 homes for about $689,000. The additional borrowed funds were intended to cover Fortner's cost of acquiring and

developing the vacant real estate, and the cost of erecting the houses.

The impact of the agreement on the market for the tied product (prefabricated houses) is not in dispute. On the one hand, there is no claim—nor could there be—that the Home Division had any dominance in the prefabricated housing business. The record indicates that it was only moderately successful, and that its sales represented a small fraction of the industry total.[3] On the other hand, we have already held that the dollar value of the sales to respondent was sufficient to meet the "not insubstantial" test described in earlier cases. See 394 U. S., at 501-502. We therefore confine our attention to the source of the tying arrangement—petitioners' "economic power" in the credit market.

## II

The evidence supporting the conclusion that the Credit Corp. had appreciable economic power in the credit market relates to four propositions: (1) petitioner Credit Corp. and the Home Division were owned by one of the Nation's largest corporations; (2) petitioners entered into tying arrangements with a significant number of customers in addition to Fortner; (3) the Home Division charged respondent a noncompetitive price for its prefabricated homes; and (4) the financing provided to Fortner was "unique," primarily because it covered 100% of Fortner's acquisition and development costs.

The Credit Corp. was established in 1954 to provide financing for customers of the Home Division. The United States Steel Corp. not only provided the equity capital, but also allowed the Credit Corp. to use its credit in order

---

[3] In 1960, for example, the Home Division sold a total of 1,793 houses for $6,747,353. There were at least four larger prefabricated home manufacturers, the largest of which sold 16,804 homes in that year. In the following year the Home Division's sales declined while the sales of each of its four principal competitors remained steady or increased.

to borrow money from banks at the prime rate. Thus, although the Credit Corp. itself was not a particularly large company, it was supported by a corporate parent with great financial strength.

The Credit Corp.'s loan policies were primarily intended to help the Home Division sell its products.[4] It extended credit only to customers of the Home Division, and over two-thirds of the Home Division customers obtained such financing. With few exceptions, all the loan agreements contained a tying clause comparable to the one challenged in this case. Petitioner's home sales in 1960 amounted to $6,747,353. Since over $4,600,000 of these sales were tied to financing provided by the Credit Corp.,[5] it is apparent that the tying arrangement was used with a number of customers in addition to Fortner.

The least expensive house package that Fortner purchased from the Home Division cost about $3,150. One witness testified that the Home Division's price was $455 higher than the price of comparable components in a conventional home; another witness, to whom the District Court made no reference in its findings, testified that the Home Division's price was $443 higher than a comparable prefabricated product. Whether the price differential was as great as 15% is not entirely clear, but the record does support the conclusion that the contract required Fortner to pay a noncompetitive price for the Home Division's houses.

The finding that the credit extended to Fortner was unique

---

[4] After reviewing extensive evidence taken from the files of the Credit Corp., including a memorandum stating that "our only purpose in making the loan . . . is shipping houses," the District Court expressly found "that the Credit Corporation was not so much concerned with the risks involved in loans but whether they would help sell houses." App. 1588–1589.

[5] This figure is not stated in the District Court's findings; it is derived from the finding of total sales and the finding that 68% of the sales in 1960 were made to dealers receiving financial assistance from the Credit Corp. See id., at 1589–1590.

was based on factors emphasized in the testimony of Fortner's expert witness, Dr. Masten, a professor with special knowledge of lending practices in the Kentucky area. Dr. Masten testified that mortgage loans equal to 100% of the acquisition and development cost of real estate were not otherwise available in the Kentucky area; that even though Fortner had a deficit of $16,000, its loan was not guaranteed by a shareholder, officer, or other person interested in its business; and that the interest rate of 6% represented a low rate under prevailing economic conditions.[6] Moreover, he explained that the stable price levels at the time made the risk to the lender somewhat higher than would have been the case in a period of rising prices. Dr. Masten concluded that the terms granted to respondent by the Credit Corp. were so unusual that it was almost inconceivable that the funds could have been acquired from any other source. It is a fair summary of his testimony, and of the District Court's findings, to say that the loan was unique because the lender accepted such a high risk and the borrower assumed such a low cost.

The District Court also found that banks and federally insured savings and loan associations generally were prohibited by law from making 100% land acquisition and development loans, and "that other conventional lenders would not have made such loans at the time in question since they were not prudent loans due to the risk involved." App. 1596.

Accordingly, the District Court concluded "that all of the required elements of an illegal tie-in agreement did exist since the tie-in itself was present, a not insubstantial amount of interstate commerce in the tied product was restrained and the Credit Corporation did possess sufficient economic power or leverage to effect such restraint." *Id.*, at 1602.

---

[6] The prime rate at the time was 5% or 5½%.

## III

Without the finding that the financing provided to Fortner was "unique," it is clear that the District Court's findings would be insufficient to support the conclusion that the Credit Corp. possessed any significant economic power in the credit market.

Although the Credit Corp. is owned by one of the Nation's largest manufacturing corporations, there is nothing in the record to indicate that this enabled it to borrow funds on terms more favorable than those available to competing lenders, or that it was able to operate more efficiently than other lending institutions. In short, the affiliation between the petitioners does not appear to have given the Credit Corp. any cost advantage over its competitors in the credit market. Instead, the affiliation was significant only because the Credit Corp. provided a source of funds to customers of the Home Division. That fact tells us nothing about the extent of petitioners' economic power in the credit market.

The same may be said about the fact that loans from the Credit Corp. were used to obtain house sales from Fortner and others. In some tying situations a disproportionately large volume of sales of the tied product resulting from only a few strategic sales of the tying product may reflect a form of economic "leverage" that is probative of power in the market for the tying product. If, as some economists have suggested, the purpose of a tie-in is often to facilitate price discrimination, such evidence would imply the existence of power that a free market would not tolerate.[7] But in this case Fortner was only required to purchase houses for the number of lots for which it received financing. The tying product produced no commitment from Fortner to purchase varying quantities of the tied product over an extended period of time. This record, therefore, does not de-

---

[7] See Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957).

scribe the kind of "leverage" found in some of the Court's prior decisions condemning tying arrangements.[8]

The fact that Fortner—and presumably other Home Division customers as well—paid a noncompetitive price for houses also lends insufficient support to the judgment of the lower court. Proof that Fortner paid a higher price for the tied product is consistent with the possibility that the financing was unusually inexpensive [9] and that the price for the entire package was equal to, or below, a competitive price. And this possibility is equally strong even though a number of Home Division customers made a package purchase of homes and financing.[10]

---

[8] See *e. g., United Shoe Machinery* v. *United States,* 258 U. S. 451; *International Business Machines* v. *United States,* 298 U. S. 131; *International Salt Co.* v. *United States,* 332 U. S. 392. In his article in the 1969 Supreme Court Review 16, Professor Dam suggests that this kind of leverage may also have been present in *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1.

[9] Fortner's expert witness agreed with the statement:

"The amount of the loan as a percentage of the collateral or security is only one element in determining its advantage to a borrower. The other relevant factors include the rate of interest charged, whether the lender discounts the amount loaned or charges service for [sic] other fees and maturity in terms of repayment." App. 1686.

[10] Relying on *Advance Business Systems & Supply Co.* v. *SCM Corp.,* 415 F. 2d 55 (CA4 1969), cert. denied, 397 U. S. 920, Fortner contends that acceptance of the package by a significant number of customers is itself sufficient to prove the seller's economic power. But this approach depends on the absence of other explanations for the willingness of buyers to purchase the package. See 415 F. 2d, at 68. In the *Northern Pacific* case, for instance, the Court explained:

"The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power, at least where, as here, no other explanation has been offered for the existence of these restraints. The 'preferential routing' clauses conferred no benefit on the purchasers or lessees. While they got the land they wanted by yielding their freedom to deal with competing carriers, the defendant makes no claim

The most significant finding made by the District Court related to the unique character of the credit extended to Fortner. This finding is particularly important because the unique character of the tying product has provided critical support for the finding of illegality in prior cases. Thus, the statutory grant of a patent monopoly in *International Salt Co.* v. *United States,* 332 U. S. 392; the copyright monopolies in *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, and *United States* v. *Loew's Inc.,* 371 U. S. 38; and the extensive land holdings in *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1,[11] represented tying products that the Court regarded as sufficiently unique to give rise to a presumption of economic power.[12]

---

that it came any cheaper than if the restrictive clauses had been omitted. In fact any such price reduction in return for rail shipments would have quite plainly constituted an unlawful rebate to the shipper. So far as the Railroad was concerned its purpose obviously was to fence out competitors, to stifle competition." 356 U. S., at 7–8 (footnote omitted).

As this passage demonstrates, this case differs from *Northern Pacific* because use of the tie-in in this case can be explained as a form of price competition in the tied product, whereas that explanation was unavailable to the Northern Pacific Railway.

[11] The Court in *Northern Pacific* concluded that the railroad "possessed substantial economic power by virtue of its extensive landholdings" and then described those holdings as follows:

"As pointed out before, the defendant was initially granted large acreages by Congress in the several North-western States through which its lines now run. This land was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities." *Id.,* at 7.

[12] "Since one of the objectives of the patent laws is to reward uniqueness, the principle of these cases was carried over into antitrust law on the theory that the existence of a valid patent on the tying product, without more, establishes a distinctiveness sufficient to conclude that any tying arrangement involving the patented product would have anti-

As the Court plainly stated in its prior opinion in this case, these decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. See 394 U. S., at 502–503. They do, however, focus attention on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market.[13] In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

Without any such advantage differentiating his product from that of his competitors, the seller's product does not

---

competitive consequences." *United States* v. *Loew's Inc.*, 371 U. S. 38, 46.

[13] "Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." 394 U. S., at 504.

Professor Dam correctly analyzed the burden of proof imposed on Fortner by this language. In his article in the 1969 Supreme Court Review 25–26, he reasoned:

"One important question in interpreting the *Fortner* decision is the meaning of this language. Taken out of context, it might be thought to mean that, just as the 'host of tying arrangements' was 'compelling evidence' of 'great power' in *Northern Pacific*, so the inclusion of tie-in clauses in contracts with 'any appreciable numbers of buyers' establishes market power. But the passage read in context does not warrant this interpretation. For the immediately preceding sentence makes clear that market power in the sense of power over price must still exist. If the price could have been raised but the tie-in was demanded in lieu of the higher price, then—and presumably only then—would the requisite economic power exist. Thus, despite the broad language available for quotation in later cases, the treatment of the law on market power is on close reading not only consonant with the precedents but in some ways less far-reaching than *Northern Pacific* and *Loew's*, which could be read to make actual market power irrelevant." (Footnotes omitted.)

have the kind of uniqueness considered relevant in prior tying-clause cases.[14] The Court made this point explicitly when it remanded this case for trial:

"We do not mean to accept petitioner's apparent argument that market power can be inferred simply because the kind of financing terms offered by a lending company are 'unique and unusual.' We do mean, however, that uniquely and unusually advantageous terms can reflect a creditor's unique economic advantages over his competitors." 394 U. S., at 505.

An accompanying footnote explained:

"Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented and copyrighted products, e. g., *International Salt; Loew's,* or physical, as when the product is land, e. g., *Northern Pacific.* It is true that the barriers may also be economic, as when competitors are simply unable to produce the distinctive product profitably, but the uniqueness test in such situations is somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it." *Id.,* at 505 n. 2.

Quite clearly, if the evidence merely shows that credit terms are unique because the seller is willing to accept a lesser profit—or to incur greater risks—than its competitors,

---

[14] One commentator on *Fortner I* noted:

"The Court's uniqueness test is adequate to identify a number of situations in which this type of foreclosure is likely to occur. Whenever there are some buyers who find a seller's product uniquely attractive, and are therefore willing to pay a premium above the price of its nearest substitute, the seller has the opportunity to impose a tie to some other good." Note, The Logic of Foreclosure: Tie-In Doctrine after *Fortner* v. *U. S. Steel,* 79 Yale L. J. 86, 93–94 (1969).

that kind of uniqueness will not give rise to any inference of economic power in the credit market. Yet this is, in substance, all that the record in this case indicates.

The unusual credit bargain offered to Fortner proves nothing more than a willingness to provide cheap financing in order to sell expensive houses.[15] Without any evidence that the Credit Corp. had some cost advantage over its competitors—or could offer a form of financing that was significantly differentiated from that which other lenders could offer if they so elected—the unique character of its financing does not support the conclusion that petitioners had the kind of economic power which Fortner had the burden of proving in order to prevail in this litigation.

The judgment of the Court of Appeals is reversed.

*So ordered.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE REHNQUIST joins, concurring.

I concur in the Court's opinion and write only to emphasize what the case before us does *not* involve; I join on the basis of my understanding of the scope of our holding. Today's decision does not implicate ordinary credit sales of only a single product and which therefore cannot constitute a tying arrangement subject to *per se* scrutiny under § 1 of the Sherman Act. In contrast to such transactions, we are dealing here with a peculiar arrangement expressly found by the Court in *Fortner I* to involve two separate products sold by

---

[15] The opinion of the Court in *Fortner I* notes that smaller companies might not have the "financial strength to offer credit comparable to that provided by larger competitors under tying arrangements." 394 U. S., at 509. Fortner's expert witness was unaware of the financing practices of competing sellers of prefabricated homes, App. 1691–1692, but there is nothing to suggest that they were unable to offer comparable financing if they chose to do so.

two separate corporations. *Fortner Enterprises* v. *United States Steel Corp.,* 394 U. S. 495, 507 (1969). Consequently, I read the Court's assumption that a tie-in existed in this case, required as it is by the law of the case, to cast no doubt on the legality of credit financing by manufacturers or distributors.