2004 ND 154

**AG ACCEPTANCE CORPORATION, as assignee of Ag Services of America, Inc., Plaintiff and Appellee**

v.

**Cecelia GLINZ, and the Estate of Bruce Glinz, by and through Cecelia Glinz, as duly appointed representative of the Estate, Defendants and Appellants.**

No. 20030197.

Supreme Court of North Dakota.

July 26, 2004.

Rehearing Denied Sept. 3, 2004.

Jon R. Brakke, Vogel Law Firm, Fargo, N.D., for plaintiff and appellee.

Jonathan T. Garaas, Garaas Law Firm, Fargo, N.D., for defendants and appellants.

NEUMANN, Justice.

[¶ 1] Cecelia Glinz and the Estate of Bruce Glinz appealed from a summary judgment awarding Ag Acceptance Corporation ("Ag Acceptance") judgment in the amount of $238,874 on a promissory note. We affirm.

I

[¶ 2] Cecelia Glinz and her husband, Bruce Glinz, ran a farming operation. On August 15, 1997, the Glinzes signed a "Master Promissory Note" payable to Ag Services of America, Inc. ("Ag Services") to finance their 1998 crop. The note was in the amount of $750,000 with interest at 2.75 percent above the prime rate. All principal and interest was due on January 15, 1999. The note was secured by security agreements covering personal property, including farm products, equipment, government payments, and proceeds. In addition, because a portion of the proceeds were to be used to purchase agricultural supplies from Ag Services, the parties executed a document entitled "Customer Pricing Agreement, Program Fee Agreement, Release, and Disclaimer of Warranties" outlining the terms of any sales by Ag Services to the Glinzes.

[¶ 3] On October 20, 1997, Ag Services assigned its rights under the note to Ag Acceptance. On March 30, 1998, the Glinzes signed a supplement to the note increasing the principal amount of the note to $1,300,000. This supplement to the note referred to the prior assignment of the note to Ag Acceptance.

[¶ 4] On September 22, 1998, the Glinzes signed a Master Promissory Note in the amount of $1,300,000 payable to Ag Services to finance their 1999 crop. The interest rate was 2.75 percent above the prime rate and all principal and interest was due on January 15, 2000. The Glinzes again executed security agreements on

personal property and a customer pricing agreement. On February 22, 1999, Ag Services assigned its rights under the note to Ag Acceptance.

[¶ 5] Bruce Glinz died in September 1999. Cecelia Glinz was named personal representative of his estate.

[¶ 6] In February 2000, Ag Acceptance brought this action against Cecelia Glinz and the Estate of Bruce Glinz alleging the notes were in default and the Glinzes owed $859,318.31, with interest accruing at the rate of $246.75 per day. Ag Acceptance sought immediate delivery of all collateral and a deficiency judgment. Cecelia and the Estate answered, alleging that the notes were not loans of money but constituted revolving charge agreements under N.D.C.C. ch. 51–14 and that only the amounts owed at the time the notes were assigned to Ag Acceptance were due and owing. Cecelia Glinz claimed any funds advanced after the notes were assigned constituted unsecured loans on an open account to Bruce Glinz personally, and were not covered by the notes or security agreements.

[¶ 7] Ag Acceptance took possession of and sold the collateral. As a result, the 1997 note was paid in full, and Ag Acceptance sought a deficiency judgment in the amount of $232,579.93, plus $38.73 interest per diem, on the 1998 note. Both sides moved for summary judgment, and the trial court denied Glinzes' motion for summary judgment and granted Ag Acceptance's motion for summary judgment. Judgment in favor of Ag Acceptance in the amount of $238,874.08 was entered on May 1, 2003. Cecelia Glinz and the Estate of Bruce Glinz (collectively "Glinz") have appealed.

## II

[¶ 8] This case comes to us in the posture of an appeal from a summary judgment. We outlined our standard of review of appeals from a summary judgment in *Zuger v. State*, 2004 ND 16, ¶¶ 7–8, 673 N.W.2d 615 (citations omitted):

Summary judgment is a procedural device for promptly disposing of a lawsuit without a trial if there are no genuine issues of material fact or inferences which can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. "Whether summary judgment was properly granted is 'a question of law which we review de novo on the entire record.'" *Iglehart v. Iglehart*, 2003 ND 154, ¶ 9, 670 N.W.2d 343 (quoting *Wahl v. Country Mut. Ins. Co.*, 2002 ND 42, ¶ 6, 640 N.W.2d 689). On appeal, this Court decides if the information available to the trial court precluded the existence of a genuine issue of material fact and entitled the moving party to summary judgment as a matter of law. Summary judgment is appropriate against parties who fail to establish the existence of a factual dispute on an essential element of a claim on which they will bear the burden of proof at trial.

A party resisting a motion for summary judgment may not simply rely upon the pleadings or upon unsupported, conclusory allegations. "Factual assertions in a brief do not raise an issue of material fact satisfying Rule 56(e)." *Kemp v. City of Grand Forks*, 523 N.W.2d 406, 408 (N.D.1994). "Nor may a party merely reassert the allegations in his pleadings in order to defeat a summary judgment motion." *Id.*

The resisting party must present competent admissible evidence by affidavit or other comparable means which raises an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and

line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact.

In summary judgment proceedings, neither the trial court nor the appellate court has any obligation, duty, or responsibility to search the record for evidence opposing the motion for summary judgment. The opposing party must also explain the connection between the factual assertions and the legal theories in the case, and cannot leave to the court the chore of divining what facts are relevant or why facts are relevant, let alone material, to the claim for relief.

*Iglehart,* at ¶ 10 (quoting *Anderson v. Meyer Broad. Co.,* 2001 ND 125, ¶ 14, 630 N.W.2d 46 (citations omitted)). Mere speculation is not enough to defeat a motion for summary judgment, and a scintilla of evidence is not sufficient to support a claim. If no pertinent evidence on an essential element is presented to the trial court in resistance to a motion for summary judgment, it is presumed that no such evidence exists.

### III

[¶ 9] Ag Acceptance argues, and the trial court concluded, that the written agreements between the parties constitute a traditional loan of money secured by personal property. Glinz argues the agreement is a revolving charge account under N.D.C.C. ch. 51–14 between the Glinzes and Ag Services, and that any sales made to the Glinzes after the notes were assigned by Ag Services to Ag Acceptance were made to Bruce Glinz personally on an open account. Glinz therefore argues any transactions occurring after February 19, 1999, were not made under the notes, are not covered by the security agreements, and therefore are owed by Bruce Glinz personally on an open account, with an interest rate of six percent. Glinz further argues that Ag Acceptance's failure to comply with statutory requirements for revolving charge agreements under N.D.C.C. ch. 51–14 precludes the collection of certain fees and interest charges.

### A

[¶ 10] Initially, the parties dispute which state's law governs their agreements. The promissory notes contain choice of law clauses providing the agreements are deemed to have been made in Iowa and that Iowa law is to govern their interpretation. Ag Acceptance argues N.D.C.C. ch. 51–14 is therefore inapplicable, and the agreements must be construed under Iowa law. Glinz argues there are strong public policy reasons to apply North Dakota law in this case, and N.D.C.C. ch. 51–14 should control. For purposes of this case we will assume, without deciding, that North Dakota law applies.

### B

[¶ 11] The trial court concluded the parties' agreement was for a loan, not a revolving charge agreement under N.D.C.C. ch. 51–14. Glinz contends the agreement in this case falls within the definition of "revolving charge agreement" under the statute. "Revolving charge agreement" and other related relevant terms are defined in N.D.C.C. § 51–14–01:

1. "Credit service charge" means the amount, however expressed, which the retail buyer contracts to pay or pays the retail seller in excess of the amount of credit extended, representing the total charges by the retail seller incident to investigating and extending credit under a revolving charge agreement and for ex-

tending to the retail buyer the privilege of paying over a period of time therefor.

2. "Retail buyer" or "buyer" means a person who buys personal property from a retail seller, or to whom a retail seller otherwise extends credit, pursuant to a revolving charge agreement.

3. "Retail seller" or "seller" means a person who agrees to sell or sells goods or services pursuant to a revolving charge agreement and a state-chartered or national bank that extends credit by the advancement of moneys or the payment for goods or services under a revolving charge agreement.

4. "Revolving charge agreement" means a written instrument, defining the terms of credit extended from time to time pursuant thereto, pursuant to which the buyer's total unpaid balance thereunder, whenever incurred, is payable over a period of time and under the terms of which a credit service charge, other than the portion thereof consisting of late payment or other charges, is to be computed in relation to the buyer's unpaid balance from time to time.

A "loan of money" is defined in N.D.C.C. § 47–14–01:

A loan of money is a contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which the person borrowed.

[¶ 12] A contract must be interpreted to give effect to the mutual intention of the parties as it existed at the time of contracting. N.D.C.C. § 9–07–03; *Binek v. Binek*, 2004 ND 5, ¶ 13, 673 N.W.2d 594. When a contract has been reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible. N.D.C.C. § 9–07–04; *Binek*, at ¶ 13; *Kondrad ex rel. McPhail v. Bismarck Park District*, 2003 ND 4, ¶ 6, 655 N.W.2d 411. Construction of a written contract to determine its legal effect is a question of law for the court to decide, and on appeal this Court will independently examine and construe the contract to determine if the trial court erred in its interpretation. *Lamb v. Riemers*, 2003 ND 148, ¶ 6, 669 N.W.2d 113; *Kondrad*, at ¶ 6. Extrinsic evidence is properly considered only if the language of the agreement is ambiguous and the parties' intentions cannot be determined from the writing alone. *Binek*, at ¶ 13; *Lamb*, at ¶ 6. An unambiguous contract is particularly amenable to summary judgment. *Airport Inn Enters., Inc. v. Ramage*, 2004 ND 92, ¶ 10, 679 N.W.2d 269; *Kondrad*, at ¶ 6.

[¶ 13] The parties in this case reduced their agreement to writing. The August 15, 1997, promissory note provides:

FOR VALUE RECEIVED, the undersigned debtors jointly and severally, as principals, promise to pay to the order of Ag Services of America, Inc .... the principal sum of *Seven Hundred Fifty Thousand and No/100* Dollars (*$750,000.00*) or, if less, the outstanding principal balance of all loans and advances made hereunder, together with accrued interest, said principal balance and accrued interest to be due and payable in full on or before *January 15, 1999*. The undersigned agree to pay interest on the principle balance outstanding hereunder from time to time at the rate equal to *Two Pt. Seven Five* percent (*2.75%*) in excess of the Prime Rate, and shall be adjusted as of each date of change thereof to reflect changes in the Prime Rate.

The note makes numerous further references to principal and interest. The Sep-

tember 22, 1998, note is identical except the face amount is increased to $1,300,000 and the note is due on January 15, 2000.

[¶ 14] The parties' March 30, 1998, Agreement to Supplement the Master Promissory Note identifies the Glinzes as "Debtor" and Ag Services and Ag Acceptance collectively as "Lender." The supplement provides "Debtor is desirous of increasing the maximum funds available under the Note" and increases the "principal amount under the Note" to $1,300,000.

[¶ 15] The language used by the parties indicates a loan of money, not a revolving charge agreement. The notes state that the Glinzes promise to pay "the outstanding principal balance of all *loans* and advances made hereunder, together with accrued interest." The notes use the terms "principal" and "interest," denoting a loan of money, rather than the corresponding terms "credit extended" and "credit service charge," indicative of a revolving charge agreement, found in N.D.C.C. § 51–14–01. The supplement to the first note designates the parties as debtor and lender, and provides for increasing the "funds" available under the note, further indicative of a loan of money. Under the revolving charge agreement statute, the parties are designated as the "retail buyer" and "retail seller," and "credit" is extended. *See* N.D.C.C. § 51–14–01. The language of the parties' written agreement unambiguously characterizes the agreement as a loan of money, not a revolving credit agreement.

[¶ 16] Glinz argues that Ag Services sold products to the Glinzes on credit under the notes, that Ag Services was therefore a "retail seller," and that the agreement constituted a revolving charge agreement. Although the parties anticipated that a portion of the proceeds of the notes would be used to purchase products from Ag Services, the language of the notes also provides for loans and advances of money. Glinz relies upon the "Customer Pricing Policy Agreement, Program Fee Agreement, Release, and Disclaimer of Warranties" to support her assertion that this was a revolving credit agreement. The language of that document, however, indicates that all products purchased will be treated as an advance against the note, and explicitly envisions cash advances to the Glinzes:

> 3. The undersigned agrees that all products purchased, cash advanced and insurance premium due Ag Services will be charged as an advance against the undersigned's Master Promissory Note payable to Ag Services or its assignee as of the date of shipment of products or the date of the cash advanced and shall be secured by and subject to the terms of the Agricultural Security Agreement and all other agreements or documents executed in connection therewith.

The parties clearly intended their agreement to cover more than an extension of credit to finance purchases under a revolving credit agreement.

[¶ 17] Furthermore, the written agreements in this case provided that the full amounts due under the notes must be paid by a specific date. The sine qua non of a revolving charge account is that it revolves: it has no specific date upon which the total amount is due. *See* H.R. Rep. 90–1040 (1967), *reprinted in* 1968 U.S.C.C.A.N.1962, 1971 (indicating revolving credit accounts are synonymous with open-ended credit). An agricultural operating loan evidenced by a promissory note specifying that all principal and interest shall be due on a date certain shortly after completion of that crop year is not a revolving charge agreement.

[¶ 18] We conclude the trial court did not err in concluding the parties' written agreement was a loan of money, not a

revolving charge agreement under N.D.C.C. ch. 51–14.

## IV

[¶ 19] Glinz contends that, if the transaction between the parties was a loan, the agreement violated the Sherman Antitrust Act, 15 U.S.C. §§ 1–7, and the state antitrust act, N.D.C.C. ch. 51–08.1, because the agreement impermissibly tied the extension of credit to an agreement to purchase agricultural products from Ag Services.

### A

[¶ 20] The trial court concluded it did not have jurisdiction over Glinz's claimed violation of the Sherman Antitrust Act because jurisdiction under the Act is vested exclusively in the federal courts. Glinz contends state courts may consider Sherman Act violations which are pleaded as a defense in a contract action. We find it unnecessary to determine whether the trial court properly declined to exercise jurisdiction because we conclude Glinz failed to present sufficient evidence of an antitrust violation to preclude summary judgment.

### B

[¶ 21] In her brief on appeal, Glinz concedes that to establish an antitrust violation through an illegal tying of products she must show "possession of the seller of sufficient economic power with respect to the tying product to appreciably restrain a free market." The focus of the antitrust laws prohibiting tying is upon the effect on the relevant markets in which the two products are sold, not upon individual instances of a forced sale. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 16, 18, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). As the Court explained in *Jefferson Parish*, at 16, 104 S.Ct. 1551:

If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby.

[¶ 22] Thus, in order to establish an antitrust violation based upon illegal tying, it must be shown that the seller possesses significant market power in the tying market:

Having found sufficient evidence of a tying arrangement, we consider the other necessary feature of an illegal tying arrangement: appreciable economic power in the tying market. Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. at 1559. It has been defined as "the ability of a single seller to raise price and restrict output." *Fortner* [*Enters., Inc. v. United States Steel Corp.*], 394 U.S. [495,] 503, 89 S.Ct. [1252,] 1259 [22 L.Ed.2d 495 (1969)]; *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, [76 S.Ct. 994, 1005, 100 L.Ed. 1264] (1956). The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market.

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (footnote omitted). The Court in *Eastman Kodak* further noted:

"[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or

might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated."

*Id.* at 464, n. 9, 112 S.Ct. 2072 (quoting *Jefferson Parish,* 466 U.S. at 12, 104 S.Ct. 1551).

[¶ 23] In *United States Steel Corp. v. Fortner Enters., Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977), the Court addressed allegations that sale of prefabricated houses had been illegally tied to an offer of credit. Reversing a judgment of the Court of Appeals which concluded the creditor had sufficient economic power in the credit market to make the tying arrangement illegal, the Supreme Court stated:

> [T]hese decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. They do, however, focus attention on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

*Id.* at 620, 97 S.Ct. 861 (citation and footnote omitted); *see also Fortner Enters., Inc. v. United States Steel Corp.,* 394 U.S. 495, 502–03, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). Glinz has not directed our attention to any evidence in the record showing Ag Services or Ag Acceptance had some advantage in the credit market not shared by their competitors.

[¶ 24] There is nothing inherently illegal about tying the sale of one product or service to another:

It is clear, however, that not every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts.

*Jefferson Parish,* 466 U.S. at 11–12, 104 S.Ct. 1551. A tying arrangement is not illegal if the seller lacks control or power in the market:

> Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.

*Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 6–7, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *see also Jefferson Parish,* 466 U.S. at 11–12, 104 S.Ct. 1551.

[¶ 25] Glinz has not drawn our attention to any evidence in the record which demonstrates Ag Services or Ag Acceptance had significant market power or an advantage not shared by its competitors in the relevant markets. Glinz argues it may be inferred that the tying of these products appreciably restrained a free market because Ag Services does business in 35 states and the prices Ag Services charged for the tied products were higher than Glinzes could have purchased the products

for elsewhere. Neither of these facts creates an inference of market power in the tying market by Ag Services or Ag Acceptance. *See Fortner,* 429 U.S. at 617–18, 97 S.Ct. 861 (fact that lender was a subsidiary of one of the nation's largest corporations and charged a higher price for the tied product than its competitors did not demonstrate the lender had economic power in the credit market). There is no evidence showing Ag Services or Ag Acceptance had a predominant share of the market or sufficient economic power to control prices. *See Eastman Kodak,* 504 U.S. at 464, 112 S.Ct. 2072. Nor is there any evidence suggesting Glinz could not have obtained financing and products separately from other businesses. *See Jefferson Parish,* 466 U.S. at 11–12, 104 S.Ct. 1551.

[¶ 26] A party opposing a motion for summary judgment may not rely upon unsupported, conclusory allegations nor mere speculation, and a scintilla of evidence is not sufficient to support a claim. *Zuger v. State,* 2004 ND 16, ¶ 8, 673 N.W.2d 615. The resisting party must present, and draw the court's attention to, competent admissible evidence which raises a genuine issue of material fact. *Id.* Because Glinz has failed to draw our attention to any evidence showing that Ag Services or Ag Acceptance had significant market power in the relevant markets, we conclude summary judgment on the antitrust issues was appropriate.

## V

[¶ 27] We have considered the remaining issues raised by Glinz and find they were either not raised in the court below, are unnecessary to our decision, or are without merit. The judgment is affirmed.

[¶ 28] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, and DALE V. SANDSTROM, JJ., DOUGLAS L. MATTSON, D.J., concur.

[¶ 29] The Honorable DOUGLAS L. MATTSON, D.J., sitting in place of KAPSNER, J., disqualified.