2006 ND 71

Geraldine BERNABUCCI, Paul Bernabucci, Mary Bernabucci MacGrath and John R. Bernabucci and Geraldine Bernabucci, as Trustees of the John R. and Geraldine Bernabucci Charitable Remainder Trust, and Corey Nyhus, Plaintiffs and Appellants

v.

Harvey HUBER and Jan Odin, Defendants and Appellees.

No. 20050275.

Supreme Court of North Dakota.

April 3, 2006.

Stephen W. Plambeck, Nilles, Ilvedson, Stroup, Plambeck & Selbo, Ltd., Fargo, N.D., for plaintiffs and appellants.

Todd Ervin Zimmerman, Dorsey & Whitney, Fargo, N.D., for defendants and appellees.

VANDE WALLE, Chief Justice.

[¶ 1] Geraldine Bernabucci, Paul Bernabucci, Mary Bernabucci MacGrath and John R. Bernabucci and Geraldine Bernabucci, as trustees of the John R. and Geraldine Bernabucci Charitable Remainder Trust ("Bernabucci group"), and Cory Nyhus appealed from a judgment dismissing their action against Harvey Huber and Jan Odin arising from the 2002 sale of a bank holding company and denying their motion to amend the complaint. We conclude the district court properly granted summary judgment against the Bernabucci group based on a mutual release contained in a stock purchase agreement, and against Nyhus based on the terms of an offer he accepted to purchase his shares of stock. We also conclude the court did not abuse its discretion in denying the motion to amend the complaint because the amendment would be futile. We affirm.

I

[¶ 2] North Star Holding Company ("North Star") was incorporated in 1986 and is the sole shareholder of the Stutsman County State Bank ("Bank") in Jamestown. Northern Plains Investment, Inc. ("Northern") is a corporation owned by the Bernabucci group. At the time pertinent to this case, the Bernabucci group and Northern owned more than 40 percent of North Star's shares. John Bernabucci served on the board of directors of both North Star and the Bank. Nyhus was on the board of directors of the Bank and was a North Star shareholder. Huber is

the president and a director of the Bank and was a North Star shareholder and director. Odin is senior vice president of the Bank and was also a North Star shareholder and director.

[¶3] In June 2000, North Star's board of directors began talking about selling the Bank. At the board's June 2001 meeting, Bernabucci discussed the possibility of Huber assembling a group to make the purchase. On December 28, 2001, Huber submitted an offer to the board to purchase between 51 percent and 100 percent of North Star's shares for $425 per share. Huber made the offer "[o]n behalf of myself, and as agent for the owners of the following North Dakota banks (McIntosh County Bank in Ashley, Garrison State Bank and Trust in Garrison, Union State Bank in Hazen, and Security State Bank in Wishek)." The offer acknowledged that "North Star has recently paid a cash dividend of $10 per share, but no additional dividends will be paid prior to closing." The offer required preparation and execution of a stock purchase agreement and prompt submission of the transaction for regulatory approval. Robert Kauphusman, North Star's board president, transmitted this offer to all shareholders in a letter dated December 31, 2001.

[¶4] On January 4, 2002, Bernabucci wrote a letter to North Star's shareholders informing them that North Star was expecting two additional offers from other qualified buyers and encouraging them to withhold any action on Huber's proposal until the additional offers could be reviewed. On March 29, 2002, Bernabucci again wrote to North Star shareholders and informed them that when Huber made the December 28, 2001, offer "he failed to disclose to the shareholders that there was a tax refund and other credits of approximately $450,000 that was going to be paid shortly after the first of [the] year. Obvi-ously the earnings on the Bank's business in 2002 through the date of closing were not considered as part of the purchase price." A majority of North Star's shareholders, including Nyhus, however, had accepted Huber's offer by mid-January 2002 and placed their shares in escrow. No shareholder sought to rescind or revoke their acceptance of the December 28, 2001, offer.

[¶5] Over the course of the next several months, Bernabucci attempted to negotiate a higher sales price with the buyers for the Bernabucci group's North Star shares. In February and March 2002, Bernabucci, through his attorney, proposed a purchase price of $475 per share based on the same terms set forth in Huber's December 28, 2001, offer which contemplated that no further dividend would be paid before closing. In April 2002, Bernabucci's attorney proposed a purchase price of $450 per share, again based on the same conditions set forth in the December 2001 offer. The attorney wrote to the buyers and objected to the $425 per share price because of the Bank's expected accumulation of cash and operating income through the closing date and the possibility that the Bank would receive tax refunds and tax credits, resulting in a "windfall" to the buyers of "approximately $25.68/share." The buyers responded on April 26, 2002, and offered to increase the purchase price to $430 per share which, with interest, would total more than $440 per share assuming a September 30, 2002, closing date. On May 2, 2002, the attorney advised the buyers that the Bernabucci group would accept a purchase price of $440 per share with no interest. The buyers accepted the offer.

[¶6] The buyers and the Bernabucci group entered into a stock purchase agreement on June 10, 2002. Unlike the December 28, 2001, offer accepted by Nyhus

and other shareholders, the stock purchase agreement did not expressly preclude the payment of future dividends before the closing date. The agreement provided that "[t]he business of [Northern], North Star and the Bank shall be carried on in a normal manner without commitments of any special or unusual type or any type unrelated to normal and customary business of [Northern], North Star and the Bank." The agreement further provided "Sellers agree that after the date of this Agreement they will not take any action which would impede Buyers' ability to obtain regulatory approvals for the transactions contemplated hereunder." The agreement also included the following "*Mutual Release*":

> Except for the obligations specifically set forth in this Agreement, Buyers, North Star and Bank, hereby fully release Sellers, and Sellers hereby fully release Buyers, North Star and Bank (and all of their affiliated entities, directors, shareholders, officers, agents, attorneys, and employees, whether in their individual or official capacity) from any and all claims, demands, actions, liabilities, damages or demands of any kind whatsoever (whether such claims are known or unknown) arising out of or in any way connected with the acquisition of North Star by Buyers. This release is specifically intended to include (but not be limited to) the full release by Sellers of any claims they may have against Mr. Harvey Huber, Mr. Robert Kauphusman and Mr. Maynard Helgaas for any actions they took (or failed to take) in connection with the solicitation of offers and the negotiation of the sale of North Star to Buyers. This release is not intended to include any claim against the above individuals that Sellers may have that is unrelated in any way to the solicitation of offers for, or the negotiation and sale of, North Star,

provided, however, that Sellers hereby represent and warrant that, to the best of their knowledge, they are not currently aware of facts or circumstances upon which such a claim could be made.

Nyhus, who had accepted the buyers' December 28, 2001, offer, was not a party to the stock purchase agreement.

[¶ 7] After execution of the stock purchase agreement, the buyers had agreed to acquire all of the outstanding shares of North Star. The buyers decided to use cash held by the Bank to pay for part of the $16 million purchase price by having the Bank pay North Star a dividend after the closing and having North Star pay the dividend to the buyers as the new owners. The buyers informed the Federal Reserve Board of their plan to use $2 million controlled by North Star and the Bank for this purpose and that no dividend would be issued before the closing date. The Bernabucci group and Nyhus claim Huber did not inform the boards of North Star or the Bank of the buyers' intentions.

[¶ 8] At the Bank's board meeting on August 13, 2002, Bernabucci made a motion that the Bank declare a $35 per share dividend to North Star, to be paid out by North Star to its shareholders of record on September 10, 2002. Bernabucci indicated the dividend was justified by the amount of Bank earnings from April 1, 2002, through September 30, 2002, the projected closing date, and by the expected tax refund. No one seconded Bernabucci's motion. Nyhus and Bernabucci eventually moved to declare a dividend of $18 per share. The motion carried, but Huber and Maynard Helgaas, another board member, voted against it. At the North Star board meeting held the same day, Bernabucci moved that North Star pay an $18 per share dividend to all shareholders of record on September 10, 2002. The motion carried, but Huber and Odin voted against it.

[¶ 9]  On August 29, 2002, the attorney for the buyers wrote to the Bernabucci group's attorney and informed him that Bernabucci's efforts to have North Star pay a dividend before the closing date were "inconsistent with his contractual obligations under the Stock Purchase Agreement," and that if the dividend were paid, the buyers would bring a legal action against the Bernabucci group.  The letter pointed out the stock purchase agreement required that the Bank and North Star's business be conducted in "a normal manner without commitments of any special or unusual type," and that "[i]n its entire history, North Star has never paid a dividend to its shareholders except for the $10.00 per share dividend declared and paid in December 2001 for which Buyers gave ... specific written consent."  The letter also pointed out that regulatory applications had been filed with the Federal Reserve Board indicating no dividends would be paid before the closing and the issuance of the dividend would require the buyers to refile their regulatory applications.

[¶ 10]  The North Star board of directors held a special board meeting on September 3, 2002, to retain a law firm to act as counsel on North Star's behalf and to reconsider the dividend issue.  Bernabucci objected to the other board members' participation, alleging they had conflicts of interest.  The board decided to hold a shareholder meeting to resolve the dividend question.  The Bank's board of directors met again on September 10, 2002, and was informed that the buyers had received regulatory approval and would close on September 12, 2002, leaving insufficient time to conduct a shareholder meeting.  Nyhus made a motion to authorize a dividend of $13.50 per share payable on September 10, 2002.  The motion passed with all directors voting in favor except Huber.  North Star also held a board meeting following the Bank's board meeting.  At that meeting, Bernabucci moved to authorize issuance of a cash dividend of $13.50 per share.  Kauphusman and Bernabucci voted in favor of the dividend, Huber and Odin voted against the dividend, and Helgaas abstained from voting.  The motion failed, no dividend was paid to the shareholders, the purchase was closed, and the buyers paid all shareholders $440 per share, including Nyhus and others who had initially agreed to sell their shares for $425 per share.

[¶ 11]  The Bernabucci group and Nyhus brought this action against Huber and Odin in June 2003.  The complaint alleged Huber and Odin were liable for damages because they had a conflict of interest that precluded them from voting to rescind the dividend previously declared by the board of directors and because they breached the fiduciary duties they owed to the shareholders as directors.  In November 2004, the Bernabucci group and Odin moved to amend the complaint to join North Star, Kauphusman and Helgaas as defendants and to assert additional claims for breach of contract, actual fraud, constructive fraud, deceit, consumer fraud, misrepresentation, breach of fiduciary duty, unjust enrichment, constructive trust and exemplary damages.

[¶ 12]  The district court granted Huber and Odin's motion for summary judgment and denied the Bernabucci group and Nyhus's motion to amend the complaint.  The court ruled Nyhus was not entitled to any relief because he had signed the December 28, 2001, offer which stated that no additional dividends would be paid.  The court ruled the Bernabucci group's claims were barred by "the clear language contained in the Mutual Release."  The court denied the motion to amend the complaint because the amendment "would be futile."

## II

[¶ 13] On appeal, the Bernabucci group and Nyhus argue the district court erred in granting summary judgment dismissal of their action and in refusing to grant their motion to amend the complaint.

### A

[¶ 14] Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no disputed genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. *Ernst v. Acuity,* 2005 ND 179, ¶ 7, 704 N.W.2d 869. Whether a district court properly granted summary judgment is a question of law that we review de novo on the entire record. *Miller v. Diamond Res., Inc.,* 2005 ND 150, ¶ 8, 703 N.W.2d 316.

[¶ 15] Resolution of the summary judgment issue regarding the Bernabucci group's claims requires an interpretation of the mutual release, which is governed by principles of contract law. The language of a contract governs its interpretation if the language is clear and explicit and does not involve an absurdity. N.D.C.C. § 9–07–02. "The words of a contract are to be understood in their ordinary and popular sense rather than according to their strict legal meaning, unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." N.D.C.C. § 9–07–09. A contract must be interpreted to give effect to the mutual intentions of the parties as it existed at the time of contracting. N.D.C.C. § 9–07–03; *Binek v. Binek,* 2004 ND 5, ¶ 13, 673 N.W.2d 594. When a contract has been reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible. N.D.C.C. § 9–07–04; *Kondrad ex rel. McPhail v. Bismarck Park Dist.,* 2003 ND 4, ¶ 6, 655 N.W.2d 411. Interpretation of a contract is a question of law if the intent of the parties can be ascertained from the agreement alone. *Airport Inn Enter., Inc. v. Ramage,* 2004 ND 92, ¶ 10, 679 N.W.2d 269. Extrinsic evidence is properly considered if the language of the agreement is ambiguous and the parties' intentions cannot be determined from the writing alone. *Ag Acceptance Corp. v. Glinz,* 2004 ND 154, ¶ 12, 684 N.W.2d 632. An unambiguous contract is particularly amenable to summary judgment. *Garofalo v. St. Joseph's Hosp.,* 2000 ND 149, ¶ 7, 615 N.W.2d 160. On appeal, this Court will independently review a contract to determine whether the district court erred in its interpretation of it. *Kondrad,* at ¶ 6.

[¶ 16] The mutual release clearly states that "Buyers, North Star and Bank, hereby release Sellers, and Sellers hereby fully release Buyers, North Star and Bank (and all of their affiliated entities, directors, shareholders, officers, agents, attorneys, and employees, whether in their individual or official capacity) from any and all claims, demands, actions, liabilities, damages or demands of any kind whatsoever (whether such claims are known or unknown) arising out of or in any way connected with the acquisition of North Star by Buyers." The release further provides that it "is specifically intended to include (but not be limited to) the full release by Sellers of any claims they may have against Mr. Harvey Huber, Mr. Robert Kauphusman and Mr. Maynard Helgaas for any actions they took (or failed to take) in connection with the solicitation of offers and the negotiation of the sale of North Star to Buyers," but "is not intended to include any claim against the above individuals that Sellers may have that is unre-

lated in any way to the solicitation of offers for, or the negotiation and sale of, North Star." The mutual release broadly releases North Star and its directors and employees from any claims by the Bernabucci group related in any way to the solicitation of offers for and the negotiation and sale of North Star.

[¶ 17] The issue is, therefore, whether the Bernabucci group's claims regarding payment and rescission of the North Star dividend in 2002 are related in any way to the sale of North Star. The undisputed evidence establishes that the payment of a dividend was related to the sale.

[¶ 18] The minutes of North Star's January 15, 2002, board of director's meeting reflect that Bernabucci indicated the sales price for the shares needed to be supplemented with "another dividend the first week of June to cover additional earnings prior to closing. Because this dividend was deleted from the Huber offer, [Bernabucci] sees that his approval was not given." At the board's meeting on April 9, 2002, Bernabucci again said "he could accept the Huber offer of $425/share if the Holding Company would be allowed to declare an additional dividend in June 2002," adding "we have a responsibility to all shareholders to not leave that money lying on the table." At the board's meeting on August 13, 2002, Bernabucci made motions to declare an $18 dividend, and although "he was not happy with [the] $18 per share dividend, [] he too wants a compromise to all of this."

[¶ 19] In Bernabucci's deposition testimony, he also explained the relationship between the issuance of a dividend and the sale of North Star:

Q. Did you ever tell Mr. Huber or Mr. Kauphusman that $425 would be an adequate price?

A. I believe it was in a phone conversation with Mr. Kauphusman subsequent to November 29th, possibly in early December, that we could possibly, and Mr. Kauphusman made light of my word possibly, accept four and a quarter a share if we could declare another significant dividend prior to the closing.

Q. And what would be the purpose of declaring a dividend prior to the closing?

A. To increase the value to the shareholders.

Q. To effectively increase the price being paid to the shareholders?

A. To something near or slightly above 450 a share.

. . . .

Q. And was that your basis for wanting a further dividend to be paid?

A. Or a higher price. One or the other. To bring the value to the shareholders up to the minimum of 450.

Q. And either approach would accomplish the same goal, either increase the price or you could issue a dividend?

A. Correct.

Q. And the effect of issuing a dividend is to effectively provide the sellers with more value and to provide the buyers with a little less value.

A. Well, yeah. It would actually have been preferential for the sellers to acquire the higher—to obtain the higher price on the sale. Which would be taxed as a capital gain. The dividend, of course, would be taxed as ordinary income. So I would have preferred the $450 a share price.

There was an undisputed connection between the issuance of a dividend and the sale of North Star.

[¶ 20] The Bernabucci group argues summary judgment was erroneously granted because the district court relied upon events which occurred after the June 2002 stock purchase agreement was signed and considered extrinsic evidence in the form of board minutes and Bernabucci's deposition testimony in reaching its decision. Because the court did so, the Bernabucci group argues the court determined the mutual release was ambiguous, rendering the determination of the parties' intent a question of fact inappropriate for summary judgment disposition.

[¶ 21] We reject these arguments. First, the mutual release covered claims arising from the "sale of [] North Star." Although the stock purchase agreement was signed in June 2002, the actual sale was not completed until the closing in September 2002. Second, the Bernabucci group is correct that, when the terms of a contract are ambiguous, extrinsic evidence of the parties' intent may be considered and the terms of the contract and the parties' intent become questions of fact. *See, e.g., Moen v. Meidinger,* 547 N.W.2d 544, 547 (N.D.1996). However, when reasonable persons can draw but one conclusion, a question of fact becomes a matter of law for the court to decide. *See, e.g., Smith ex rel. Smith v. Kulig,* 2005 ND 93, ¶ 14, 696 N.W.2d 521. Here, the district court simply relied upon undisputed facts to determine whether the unambiguous provisions of the mutual release were applicable. But even if resort to extrinsic evidence was justified by an ambiguity in the mutual release or a latent ambiguity in the contract, *see Gawryluk v. Poynter,* 2002 ND 205, ¶ 10, 654 N.W.2d 400 (latent ambiguity is "an ambiguity arising when a writing appears unambiguous on its face, but some collateral matter makes the meaning uncertain"), the result would be the same. If the extrinsic evidence is con-

clusive and undisputed, the determination of the meaning of a contract is a function for the court to resolve as a matter of law. *See, e.g., Continental Cas. Co. v. Northwestern Nat. Ins. Co.,* 427 F.3d 1038, 1041 (7th Cir.2005); *Daimler Chrysler Corp. v. Graves Sheet Metal,* 827 N.E.2d 607, 613 (Ind.App.2005); *Labor Ready, Inc. v. Abis,* 137 Md.App. 116, 767 A.2d 936, 944 (2001); *Deutz & Crow Co., Inc. v. Anderson,* 354 N.W.2d 482, 486 (Minn.App.1984); *Mallad Constr. Corp. v. County Fed. Sav. and Loan Ass'n,* 32 N.Y.2d 285, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96 (1973); *Brown v. Weis,* 871 P.2d 552, 559 (Utah App.1994).

[¶ 22] The Bernabucci group also relies on N.D.C.C. § 9–13–02, which provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him, must have materially affected his settlement with the debtor.

The Bernabucci group argues their claims are still viable because "there is no evidence Bernabucci 'knew' at the time he signed the Mutual Release that other directors in North Star would first vote to declare and then vote to rescind a dividend after receiving payment of an equivalent dividend from the Bank." The Bernabucci group's reliance on the statute is misplaced. Although the stock purchase agreement did not foreclose the possibility of further dividends, neither did it guarantee that further dividends would be declared before the closing. Bernabucci's plans to continue to seek a dividend after he signed the stock purchase agreement cannot be construed to be a guarantee of a dividend that would have materially affected his decision to enter into the agreement if further dividends were not forthcoming. Bernabucci had no knowledge whether the board would or would not approve distri-

bution of a dividend before he signed the agreement. Section 9–13–02, N.D.C.C., is therefore inapplicable under the circumstances.

[¶ 23] We conclude the district court properly granted summary judgment dismissal of the Bernabucci group's claims.

### B

[¶ 24] Nyhus argues the district court improperly granted summary judgment dismissing his claims because he did not sign the June 2002 stock purchase agreement containing the mutual release.

[¶ 25] Nyhus accepted the December 28, 2001, offer from the Huber group and tendered his shares for sale. That offer specifically prohibited the payment of further dividends. *See* N.D.C.C. § 10–19.1–92(1)(c) (the right of a board to authorize distributions may be restricted by agreement). Although Nyhus argues the prohibition on payment of further dividends should not be given effect because no purchase agreement was prepared as called for by the December 28, 2001, offer and because the closing was delayed beyond the contemplated closing date of the end of March 2002, Nyhus accepted payment for his shares of stock when the sale was finally closed on September 12, 2002. A party who accepts performance in a manner different from that required by contract acquiesces in any nonconforming performance. *See Dangerfield v. Markel,* 252 N.W.2d 184, 191 (N.D.1977); N.D.C.C. § 9–12–01.

[¶ 26] We conclude the district court properly granted summary judgment dismissal of Nyhus's claims.

### C

[¶ 27] The Bernabucci group and Nyhus contend the district court abused its discretion in denying their motion to amend the complaint.

[¶ 28] Once a responsive pleading has been served, a complaint may be amended only by leave of court or by written consent of the adverse party. N.D.R.Civ.P. 15(a); *Farmers Alliance Mut. Ins. Co. v. Hulstrand Constr., Inc.,* 2001 ND 145, ¶ 10, 632 N.W.2d 473. Although leave to amend a pleading "shall be freely given when justice so requires," N.D.R.Civ.P. 15(a); *Greenwood v. American Family Ins. Co.,* 398 N.W.2d 108, 111 (N.D.1986), leave to amend is not to be granted automatically. *See Isaac v. State Farm Mut. Auto. Ins. Co.,* 547 N.W.2d 548, 551 (N.D.1996). A decision on a motion to amend a pleading under N.D.R.Civ.P. 15(a) is within the sound discretion of the district court and will not be overturned on appeal in the absence of an abuse of discretion. *First Interstate Bank v. Rebarchek,* 511 N.W.2d 235, 243 (N.D. 1994). A trial court abuses its discretion when it acts arbitrarily, unconscionably, or unreasonably, or when its decision is not the product of a rational mental process leading to a reasoned determination. *Hulstrand Constr., Inc.,* at ¶ 10.

[¶ 29] The motion to amend sought to join North Star, Kauphusman and Helgaas as defendants and to add additional claims for breach of contract, fraud, deceit, misrepresentation, breach of fiduciary duty, unjust enrichment, constructive trust and exemplary damages concerning the declaration and subsequent rescission of the dividend. The proposed additional counts essentially restate the original claim for breach of fiduciary duty with different labels, seek the benefit of the rescinded dividend, and do not change the nature of the action. *See generally Johnson v. Nodak Mut. Ins. Co.,* 2005 ND 112, ¶ 12, 699 N.W.2d 45 (in deciding which statute of limitations applies in a given case courts consider the actual nature of the action

and not the form of the remedial procedure); *Johnson v. Haugland*, 303 N.W.2d 533, 538 (N.D.1981) (same). The mutual release signed by the Bernabucci group released North Star and its directors and officers "from any and all claims" related to the sale of North Star. Consequently, the Bernabucci group cannot sue these defendants over their actions concerning the dividend. Although Nyhus did not sign the stock purchase agreement, he accepted the December 28, 2001, offer by the buyers which specifically precluded payment of further dividends before closing. Consequently, Nyhus has no valid claim arising from the failure of North Star to issue a dividend regardless of the theory advanced.

[¶ 30] A district court does not abuse its discretion when it denies a requested amendment which would be futile. *See Hulstrand Constr., Inc.*, 2001 ND 145, ¶ 10, 632 N.W.2d 473; *Messiha v. State*, 1998 ND 149, ¶ 12, 583 N.W.2d 385; *Wishnatsky v. Bergquist*, 550 N.W.2d 394, 403 (N.D.1996); *Rebarchek*, 511 N.W.2d at 243. Under these circumstances, the district court did not abuse its discretion in denying the motion to amend the complaint.

### III

[¶ 31] The judgment is affirmed.

[¶ 32] BRUCE E. BOHLMAN, S.J., DALE V. SANDSTROM, CAROL RONNING KAPSNER, and MARY MUEHLEN MARING, JJ., concur.

[¶ 33] The Honorable BRUCE E. BOHLMAN, S.J., sitting in place of CROTHERS, J., disqualified.