# United States Court of Appeals for the Federal Circuit

04-1196

INDEPENDENT INK, INC.,

Plaintiff-Appellant,

v.

ILLINOIS TOOL WORKS, INC. and TRIDENT, INC.,

Defendants-Appellees.

Edward F. O'Connor, Levin & O'Connor, of Laguna Beach, California, argued for plaintiff-appellant.

Jordan A. Sigale, Sonnenschein Nath & Rosenthal LLP, of Chicago, Illinois, argued for defendants-appellees. With him on the brief was Laura A. Wytsma, of Los Angeles, California.

Appealed from: United States District Court for the Central District of California

Judge Cormac J. Carney

# United States Court of Appeals for the Federal Circuit

04-1196

INDEPENDENT INK, INC.,

Plaintiff-Appellant,

v.

ILLINOIS TOOL WORKS, INC. and TRIDENT, INC.,

Defendants-Appellees.

_____

DECIDED:  January 25, 2005

_____

Before CLEVENGER, DYK, and PROST, <u>Circuit Judges</u>.

DYK, <u>Circuit Judge</u>.

Independent Ink, Inc. ("Independent") appeals from the judgment of the United States District Court for the Central District of California in this patent tying antitrust action.  The district court granted summary judgment on plaintiff Independent's Sherman Act section 1 claim because Independent had failed to produce any evidence of market power over the tying product.  <u>Indep. Ink, Inc. v. Trident, Inc.</u>, 210 F. Supp. 2d 1155 (C.D. Cal. 2002).  We hold that a rebuttable presumption of market power arises from the possession of a patent over a tying product.  Because no rebuttal evidence was submitted by the patent holder, we reverse the grant of summary judgment on the Sherman Act section 1 claim and remand for further proceedings.  As to Independent's Sherman Act section 2 claim, we affirm the district court's grant of summary judgment.

BACKGROUND

Defendant Trident, Inc. ("Trident") is a wholly-owned subsidiary of defendant Illinois Tool Works, Inc. ("ITW"). Trident is a manufacturer of printheads and holds a patent over its printhead technology. See U.S. Patent No. 5,343,226 ("the '226 patent"). Printer manufacturers (the "OEMs") use Trident's printhead technology to manufacture printers. The end users of the printers are usually product manufacturers, who use the printers to place bar codes on cartons.

As disclosed by the '226 patent, ink jet devices for printing bar codes consume a large quantity of ink. The small cartridges typical in other ink jet devices are impractical for such applications. But the use of a large supply of ink poses problems for transferring the ink from the container to the printhead. Specifically, one must be able to apply pressure in one direction, forcing ink towards the printhead, without sucking the ink back when that pressure is released. As reflected in the prior art and discussed by the '226 patent, there have been essentially three methods by which this could be done. First, there have been valves that allow release of the pressure without affecting the flow of ink. However, such valves must be sensitive to back pressure while being strong enough to seal the ink, and are difficult to reliably design. Second, there have been devices that pressurize the air space above the ink reservoir. But any increase in pressure in the ink container "will continue to force ink out . . . even after the pressure is removed. . . . [P]uncturing a hole in the container in the air space above the ink . . . to relieve pressure within the container . . . makes removal of partially filled containers messy." Id. col. 1, ll. 51-60. Third, there have been devices using a peristaltic pump. However, such devices are usually complex and expensive. The '226 patent discloses

an ink jet device and supply system using a hand actuated peristaltic pump. The use of hand pumping overcomes the usual complexity and expense of such devices.

Trident also manufactures ink for use with its patented printheads. Trident's standard form licensing agreement allowing the OEMs to use its patented product requires "OEMs to purchase their ink for Trident-based systems exclusively from Trident." (Br. of Appellees at 8.) Specifically, the licensing agreement grants the right to "manufacture, use and sell . . . ink jet printing devices supplied by Trident" only "when used in combination with ink and ink supply systems supplied by Trident." (J.A. at 275.) There is now no claim that the ink is protected by any of Trident's patents.[1] We thus have an explicit tying agreement conditioning the sale of a patented product (the printhead covered by the '226 patent (and possibly other patents as well)) on the sale of an unpatented one (the ink).

Independent is a competing manufacturer of ink. It manufactures ink usable in Trident's printheads. Independent filed suit in the United States District Court for the Central District of California on August 14, 1998, initially seeking a declaratory judgment of non-infringement and invalidity against Trident's patents. Independent subsequently amended its complaint to allege that Trident was engaged in illegal tying and monopolization in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1 et seq. Both parties moved for summary judgment as to the section 1 claim, and Trident moved for summary judgment as to the section 2 claim. The district court granted summary judgment in favor of Trident on both claims.

---

[1] Although Trident initially claimed patent rights over the ink used in its printheads and sued Independent for infringement, that infringement claim was dismissed with prejudice.

The district court held that for patent tying to constitute a violation of the antitrust laws, the plaintiff must affirmatively prove market power. Indep. Ink, 210 F. Supp. 2d at 1162. The district court, in a footnote, dismissed several Supreme Court cases holding to the contrary as "vintage." Id. at 1165 n.10. Addressing the Supreme Court's more recent decision in Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 16 (1984), it declined to follow the rule announced by the majority in that case that "the sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful." Instead, relying on the concurring opinion in Jefferson Parish, the dissent from a denial of certiorari by two members of the Jefferson Parish majority,[2] and academic criticisms of the presumption of market power, the district court dismissed the majority opinion of Jefferson Parish as dictum that should not be followed. Indep. Ink, 210 F. Supp. 2d at 1164-65. The district court found that Independent submitted no affirmative evidence defining the relevant market nor proving Trident's power within it, and therefore could not prevail in either antitrust claim. Id. at 1173-77.

The parties settled all their remaining claims, which were accordingly dismissed with prejudice, and final judgment was entered. This appeal followed. Because the complaint originally contained a claim for declaratory judgment of invalidity and non-infringement of the '226 patent, we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

---

[2]      Data Gen. Corp. v. Digidyne Corp., 473 U.S. 908, 908 (1985) (White, J.,

04-1196                                    4

DISCUSSION

I

The first issue before us is whether Federal Circuit or Ninth Circuit law governs the legality of patent tying under the Sherman Act, an issue which may arise both in the context of affirmative claims (as here) and in the context of a patent misuse defense. We have previously held that where an affirmative antitrust claim or antitrust misuse defense is based on "procuring or enforcing a patent," the central antitrust question is a matter governed by Federal Circuit law. Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1067-68 (Fed. Cir. 1998) (en banc in relevant part). We conclude that the antitrust consequences of patent tying likewise is a question governed by our law.[3] However, as stated in Nobelpharma, "we will continue to apply the law of the appropriate regional circuit to issues involving other elements of antitrust law," such as defining the relevant market and determining as a factual matter whether power exists within that market. Id. at 1068.

II

We now address the Sherman Act section 1 claim. This case first requires us to determine whether patent tying is illegal per se (or presumptively illegal) under the Sherman Act,[4] or whether the plaintiff is obliged to prove as part of its affirmative case that the patent confers market power in the relevant market for the tying product.

---

joined by Blackmun, J., dissenting from denial of certiorari).

[3] We note that tying as a defense in patent cases is governed by statute. 35 U.S.C. § 271(d)(5) (2000).

[4] Independent expressly states in its brief that its position before this court is that Trident's contracts violate the Sherman Act. (Br. of Appellant at 9.) Therefore, we do not consider whether there are any violations of Clayton Act § 3, 15 U.S.C. § 14 (2000).

This case comes to us with a long history of Supreme Court consideration of the legality of tying arrangements. Earlier Supreme Court cases dealing with tying agreements were extremely hostile to them, whether the case involved intellectual property or other tying products. The first case that found tying to violate section 1 of the Sherman Act was a patent tying case. Int'l Salt Co. v United States, 332 U.S. 392 (1947).[5] In Standard Oil Co. v. United States, 337 U.S. 293, 305 (1949), the Court commented that "[t]ying agreements serve hardly any purpose beyond the suppression of competition." In Northern Pacific Railway Co. v. United States, 356 U.S. 1 (1958), the Court held again that:

> Tying arrangements . . . flout the Sherman Act's policy that competition rule the marts of trade. . . . By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the "tied" product's merits and insulates it from the competitive stresses of the open market.

Id. at 10 (quoting Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 605 (1953)). The Court held that Northern Pacific's conditioning the lease of its land to shipping commodities on its railway lines violated the Sherman Act, because Northern Pacific's landholdings gave it "sufficient economic power to impose an appreciable restraint on free competition in the tied product." Id. at 11.

Later Supreme Court cases reflected divergent treatment, depending on whether statutory intellectual property was involved. Those cases not involving patents or copyrights refined the test, holding that tying was only unlawful if the defendant had

---

[5]    Prior to this, the Court had found tying, including patent tying, to violate section 3 of the Clayton Act in an action to enjoin the enforcement of patent tying agreements. United Shoe Mach. Corp. v. United States, 258 U.S. 451 (1922). It had also found patent tying to be a defense in a patent infringement action. Motion Picture Patents Co. v. Universal Film Mfg., 243 U.S. 502 (1917).

"market power" in the market for the tying product. As articulated in <u>United States Steel Corp. v. Fortner Enterprises, Inc.</u>, 429 U.S. 610, 620 (1977) ("Fortner II"), this requirement of "market power" necessitated an inquiry into "whether the seller has the power, within the market for the tying product, to raise prices or to require purchasers to accept burdensome terms that could not be exacted in a completely competitive market." The requirement of demonstrating sufficient market power to raise prices was notably more onerous than the <u>Northern Pacific</u> requirement that there be some power to "appreciably restrain free competition."[6]

The Supreme Court further explained the requirement for market power in the 1984 <u>Jefferson Parish</u> decision, which involved an agreement requiring patients of a hospital to use a particular anesthesiology firm. The Court stated that "certain tying arrangements pose an unacceptable risk of stifling competition." 466 U.S. at 9. But the "unacceptable risk of stifling competition" arises, and consequent liability attaches, only if there is anticompetitive "forcing." As explained by the Court:

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

---

[6] Under the <u>Northern Pacific</u> test, market power could be inferred from having "unique economic advantages" of some kind. <u>Fortner Enters., Inc. v. United States Steel Corp.</u>, 394 U.S. 495, 505 (1969) ("Fortner I"). In contrast, <u>Fortner II</u> requires the ability to actually raise prices in a relevant market. Since <u>Jefferson Parish</u> found a 30% market share inadequate, lower courts in subsequent cases have generally refrained from condemning tying arrangements where the defendant had less than a 30% market share. <u>See</u> Herbert Hovenkamp, <u>Federal Antitrust Policy: The Law of Competition and Its Practice</u> § 10.3, at 397 & n.19 (2d ed 1999) (collecting cases).

Id. at 12. The requirement of proving "forcing" or "market power" in cases not involving intellectual property necessitates a definition of the market in which such power is alleged to exist and showing an "actual adverse effect on competition." Id. at 29-31. The Supreme Court reaffirmed the requirement of market power in such cases in Eastman Kodak Co. v. Image Technical Services, 504 U.S. 451, 462 (1992), where it held that tying "violates § 1 of the Sherman Act if the seller has 'appreciable economic power' in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market."

The Court's treatment of tying cases when the tying product is patented or copyrighted, however, has been more consistent. In the 1947 International Salt case, the defendant held patents over "machines for utilization of salt products." 332 U.S. at 394. It leased these machines on the condition that the lessee purchase from the defendant "all unpatented salt and salt tablets consumed in the leased machines." Id. The Supreme Court held that this arrangement violated the Sherman Act, holding that "the patents confer no right to restrain use of, or trade in, unpatented salt." Id. at 395-96. The Court found that by tying the lease of machines to the purchase of salt, and "contracting to close this market for salt against competition, [the defendant] engaged in a restraint of trade for which its patents afford no immunity from the antitrust laws." Id. at 396. The Court made no inquiry of the defendant's market power, finding that "the admitted facts left no genuine issue. . . . [T]he tendency of the [patent tying] arrangement to accomplishment of monopoly seems obvious." Id.

In United States v. Loew's, Inc., 371 U.S. 38 (1962), relying on International Salt, the Court made clear that, where the tying product is patented or copyrighted, market

power may be presumed rather than proven. Loew's involved the tying of less popular films to popular copyrighted films by movie distributors in their licenses to television stations. The Court stated that in tying cases not involving intellectual property the "standard of illegality is that the seller must have sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." Id. at 45. However, "[t]he requisite economic power is presumed when the tying product is patented or copyrighted." Id. The Loew's Court confirmed that patent tying is a distinct doctrine when it noted defendants' argument "that their behavior is not to be judged by the principle of the patent cases . . . , but by the general principles which govern the validity of tying arrangements of nonpatented products." Id. at 48. The Loew's Court also stated that it needed not inquire into whether the distributors had market power. "[T]he mere presence of competing substitutes for the tying product . . . is insufficient to destroy the legal, and indeed the economic, distinctiveness of the copyrighted product." Id. at 49.

The subsequent Supreme Court cases that have required proof of market power in tying cases not involving intellectual property have consistently reaffirmed the holdings of International Salt and Loew's that no proof of market power is necessary in patent or copyright tying cases. The Fortner II Court in 1977 expressly restated the presumption of market power in cases of patent tying, stating that "the statutory grant of a patent monopoly in [International Salt] . . . represented tying products . . . sufficiently unique to give rise to a presumption of economic power. 429 U.S. at 619. Likewise, the Jefferson Parish Court in 1984 stated that "if the Government has granted the seller a

patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power." 466 U.S. at 16.

In sum, the Supreme Court cases in this area squarely establish that patent and copyright tying, unlike other tying cases, do not require an affirmative demonstration of market power. Rather, International Salt and Loew's make clear that the necessary market power to establish a section 1 violation is presumed. The continued validity of International Salt and Loew's as binding authority, and the distinction between patent tying and other tying cases that was articulated in Loew's, have been consistently reaffirmed by the Court ever since.[7]

III

Defendants attempt to distinguish International Salt and Loew's on the ground that they were cases brought by the United States. Specifically, they argue that International Salt and Loew's apply only to government cases because prior to Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172 (1965), private parties could not bring antitrust tying suits. This is simply incorrect. See, e.g., Switzer Bros., Inc. v. Locklin, 297 F.2d 39 (2d Cir. 1961), cert. denied, 369 U.S. 861 (1962) (private party patent tying case in 1961, four years before Walker Process). Moreover, we can see no persuasive reason to make such a distinction between

---

[7] It is noteworthy that Congress has declined to require a showing of market power for affirmative patent tying claims as opposed to patent misuse defenses based on patent tying. Proof of actual market power is required to establish a patent misuse defense based on patent tying. Act of Nov. 19, 1988, Pub. L. No. 100-703, § 201, 102 Stat. 4674, 4676 (codified at 35 U.S.C. § 271(d)(5) (2000)). The version of Public Law No. 100-703 that originally emerged from the Senate contained language also abrogating the presumption of market power in antitrust patent tying cases. See 134 Cong. Rec. 30,688-89 (1988). This language was removed in a House amendment and

government and private party plaintiffs.  There is no indication whatsoever in either International Salt or Loew's that the Court considered it important that it was the United States bringing suit.  We further note that the manifest purpose of the statute authorizing private party actions, 15 U.S.C. § 15 (2000), is to encourage the enforcement of the antitrust laws.  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130-31 (1969).  We conclude that defendants' attempt to distinguish International Salt and Loew's as involving suits brought by the United States is without merit.

IV

The defendants argue alternatively that International Salt and Loew's are no longer good law.  They offer three theories in support of this contention.  First, they point to Walker Process, where the Court stated in a patent antitrust case that it was "reluctant to extend [per se illegality] on the bare pleadings and absent examination of market effect and economic consequences."  382 U.S. at 178.  But Walker Process was a section 2 case asserting claims of monopolization, not a section 1 claim for tying.  Moreover, the gravamen of Walker Process was the inappropriate obtaining of the patent, id. at 174, not the extension of that patent beyond its terms to an unpatented article through a tying arrangement, see Int'l Salt, 332 U.S. at 395-96.  We conclude that Walker Process does not articulate a rule applicable to patent tying cases.[8]

The defendants next point to Justice O'Connor's concurrence in Jefferson Parish, which was joined by Chief Justice Burger, Justice Powell and then-Justice (now Chief

does not appear in the statute, see 134 Cong. Rec. 32,295 (1988), making clear that Congress was not attempting to change existing law in this respect.

Justice) Rehnquist, stating that it is a "common misconception . . . that a patent or copyright . . . suffices to demonstrate market power." 466 U.S. at 37 n.7 (O'Connor, J., concurring). Defendants argue that the 1984 <u>Jefferson Parish</u> concurrence, coupled with a dissent in the following year joined by two members of the <u>Jefferson Parish</u> majority,[9] imply that a then-majority of the Court indicated that <u>International Salt</u> and <u>Loew's</u> were no longer good law. The district court relied on this reasoning. <u>Indep. Ink</u>, 210 F. Supp. 2d at 1164-65. It is not persuasive. Justice White's opinion in <u>Data General</u>, joined by Justice Blackmun, did not expressly contradict <u>International Salt</u>, <u>Loew's</u>, <u>Jefferson Parish</u>, or opine that a showing of market power was required in patent and copyright tying cases. Justice White noted that the court of appeals "viewed [a] copyright . . . as creating a presumption of market power, and seemingly concluded that forcing power is sufficiently established to demonstrate per se antitrust liability if some buyers find the tying product unique and desirable." <u>Data Gen.</u>, 473 U.S. at 909. The only conclusion Justice White drew was that the case raised "several substantial questions of antitrust law and policy, including . . . what effect should be given to the existence of a copyright or other legal monopoly in determining market power." <u>Id.</u> This hardly amounts to a repudiation of the presumption of market power. More importantly, the district court's practice of "nose-counting," as one sister circuit has called it, <u>Felton v. Sec'y, United States Dep't of Educ.</u>, 739 F.2d 48, 72 n.25 (2d Cir. 1984), is "a pastime in which we do not commonly engage." <u>United States v. Curcio</u>, 712 F.2d 1532, 1542 (2d Cir. 1983).

---

[8]     Many of this court's decisions upon which defendants rely are also <u>Walker Process</u> cases. <u>See, e.g.</u>, <u>Abbott Labs. v. Brennan</u>, 952 F.2d 1346 (Fed. Cir. 1991).

The defendants finally point to the numerous academic articles criticizing the Supreme Court cases relying on a presumption of market power in patent and copyright cases.[10] We recognize that the Supreme Court precedent in this area has been subject to heavy criticism. See, e.g., Phillip E. Areeda, Einer Elhauge and Herbert Hovenkamp, 10 Antitrust Law ¶ 1737c (2d ed. 2004); Hovenkamp, Federal Antitrust Policy § 10.3 ("[M]ost patents confer absolutely no market power on their owners. . . . The economic case for 'presuming' sufficient market power . . . simply because the tying product is patented . . . is very weak."); Richard A. Posner, Antitrust Law 197-98 (2d ed. 2001) ("[M]ost patents confer too little monopoly power to be a proper object of antitrust concern. Some patents confer no monopoly power at all."). Defendants point out that, based on a student note critical of the doctrine, the Sixth Circuit has been persuaded to hold that: "Loew's [was] overbroad and . . . we reject any absolute presumption of market power for copyright or patented product . . . such a presumption is not warranted merely by existence of a copyright or patent." A.I. Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673, 676 (6th Cir. 1986).[11] The defendants also point out that two Seventh Circuit decisions, USM Corp. v. SPS Technologies, Inc., 694 F.2d 505 (7th Cir. 1982), and Will v. Comprehensive Accounting Corp., 776 F.2d 665

---

[9] Data Gen., 473 U.S at 908 (White, J., joined by Blackmun, J., dissenting from denial of certiorari).

[10] The defendants also point out that the Department of Justice and the Federal Trade Commission have resolved, as a matter of their prosecutorial discretion, not to presume that a patent or copyright confers market power. U.S. Dep't of Justice and Fed. Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property § 5.3 (1995). This of course does not affect the validity of the Supreme Court's decisions in International Salt and Loew's.

[11] The Sixth Circuit stated that its decision was "based on the cogent reasoning in Note, The Presumption of Economic Power for Patented and Copyrighted Products in Tying Arrangements, 85 Colum. L. Rev. 1140 (1985)." A.I. Root, 806 F.2d at 676.

(7th Cir. 1985), in dictum have suggested that proof of market power may be required in patent and copyright tying cases.

The fundamental error in all of defendants' arguments is that they ignore the fact that it is the duty of a court of appeals to follow the precedents of the Supreme Court until the Court itself chooses to expressly overrule them. This message has been conveyed repeatedly by the Court. The Court's "decisions remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." Hohn v. United States, 524 U.S. 236, 252-53 (1998). "If a precedent of th[e] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions." Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 (1989). Even where a Supreme Court precedent contains many "infirmities" and rests upon "wobbly, moth-eaten foundations," it remains the "Court's prerogative alone to overrule one of its precedents." State Oil Co. v. Khan, 522 U.S. 3, 20 (1997). None of the authorities that defendants present, whether it be the language of Walker Process, the concurrence in Jefferson Parish, or the dissent from denial of certiorari in Data General, constituted an express overruling of International Salt or Loew's. We conclude that the Supreme Court has held that there is a presumption of market power in patent tying cases, and we are obliged to follow the Supreme Court's direction in this respect. The time may have come to abandon the doctrine, but it is up to the Congress or the Supreme Court to make this judgment.

04-1196                                        14

V

We must therefore address the scope of the rule announced by the Supreme Court's patent and copyright tying cases. Independent submits that under International Salt and its progeny, patent tying is per se illegal in every case and market power is irrebuttably presumed. In this area, unfortunately, there is no Supreme Court case directly addressing the issue, and we are required to ascertain the rule from dictum. Loew's expressly stated that "[t]here may be rare circumstances in which the doctrine we have enunciated under § 1 of the Sherman Act prohibiting tying arrangements involving patented or copyrighted tying products is inapplicable." 371 U.S. at 49-50. Jefferson Parish confirmed that International Salt created only a presumption of market power: "[I]f the Government has granted the seller a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power." 466 U.S. at 16 (emphasis added). It would stretch the language of "fair to presume" beyond the breaking point to say that such a presumption is irrebuttable. We are obliged to follow such clearly articulated Supreme Court dicta. Ins. Co. of the West v. United States, 243 F.3d 1367, 1372 (Fed. Cir. 2001); Stone Container Corp. v. United States, 229 F.3d 1345, 1349-50 (Fed. Cir. 2000).

Other circuits have similarly interpreted the Supreme Court's patent and copyright tying cases to create a rebuttable presumption of market power. See, e.g., Digidyne Corp. v. Data Gen. Corp., 734 F.2d 1336, 1344 (9th Cir. 1984) (Copyright "created a presumption of economic power sufficient to render the tying arrangement illegal per se. The burden to rebut the presumption shifted to defendant."); Susser v. Carvel Corp., 332 F.2d 505, 521 (2d Cir. 1964) ("[W]here the tying product is patented,

the patentee should be permitted to show that in the entire factual setting . . . the patent does not create the market power requisite to illegality of the tying clause. . . . [A] patent is prima facie evidence of market control." (internal citations omitted)); but see MCA Television Ltd. v. Pub. Interest Corp., 171 F.3d 1265, 1276-79 (11th Cir. 1999) (appearing to assume that presumption is not rebuttable).

Thus, a patent presumptively defines the relevant market as the nationwide market for the patented product itself, and creates a presumption of power within this market. Once the plaintiff establishes a patent tying agreement, it is the defendant's burden to rebut the presumption of market power and consequent illegality that arises from patent tying.

VI

The district court found that, even if there was a presumption of market power in patent tying cases, any presumption of market power was rebutted in this case because

> it is undisputed that consumers could place bar-coded labels on their products before other competitors manufactured bar-coding printers, and Plaintiff does not establish that the various labeling systems are not proper substitutes for Defendants' printhead system or dispute Defendants' arguments that they are. Moreover . . . at least two other competitors . . . have designed printheads that can print bar codes on kraft paper. The fact that [two competitors] have done so indicates that any barriers to entry, such as R & D and manufacturing costs, are not so great as to prevent competitors from entering the market.

Indep. Ink., 210 F. Supp. 2d at 1167. The defendants argue that the district court was correct because there is testimony here by the president of an OEM that consumers use labels as substitutes for Trident's printhead technology, (J.A. at 983), and it is undisputed that two competitors offer competing printheads.

04-1196                                  16

However, "[t]he mere presence of competing substitutes for the tying product . . . is insufficient to destroy the legal, and indeed the economic, distinctiveness of the [patented] product." Digidyne, 734 F.2d at 1345 (quoting Loew's, 371 U.S. at 49). Rather, the definition of a market requires careful consideration of both the product and geographic markets. Bhan v. NME Hosp., Inc., 929 F.2d 1404, 1413 (9th Cir. 1991). The presumption can only be rebutted by expert testimony or other credible economic evidence of the cross-elasticity of demand, the area of effective competition, or other evidence of lack of market power. See Tanaka v. Univ. of So. Cal., 252 F.3d 1059, 1063 (9th Cir. 2001); Forro Precision, Inc. v. Int'l Bus. Machs. Corp., 673 F.2d 1045, 1052 (9th Cir. 1982). On the present record there is not sufficient evidence to rebut the presumption of market power resulting from the patent itself, or to create a genuine issue of material fact on the issue.

Accordingly, we reverse the district court's grant of summary judgment on the Sherman Act section 1 claim.[12] Because plaintiff's summary judgment motion appeared to rest entirely on a theory that the presumption of market power is irrebuttable, we remand to the district court to permit defendants an opportunity to supplement the summary judgment record with evidence that may rebut the presumption. Should the defendants on remand fail to present sufficient relevant evidence to create a genuine

---

[12] In the district court the defendants argued that summary judgment should also be denied because plaintiff failed to show two separate products and that the tying agreement affected a not insubstantial amount of commerce in the tied product. Indep. Ink, 210 F. Supp. 2d at 1162 n.7. Despite these arguments, the district court noted that "both parties seem to agree that market power will be the dispositive element in this case." Id. Defendants have not renewed these arguments on appeal, and we treat them as abandoned.

issue of material fact as to whether the presumption has been rebutted, partial summary judgment on liability under section 1 of the Sherman Act should be granted.[13]

VII

We turn next to the section 2 claim. The presumption of illegality in patent tying arises in section 1 cases. Neither International Salt nor Loew's dealt with section 2 of the Sherman Act. See Int'l Salt, 332 U.S. at 393 & n.1; Loew's, 371 U.S. at 39 & n.1. To establish a monopolization claim under section 2 of the Sherman Act, there must be monopoly power in the relevant market and the willful acquisition or maintenance of that power. Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP, 124 S. Ct. 872, 878-79 (2004). To establish an attempted monopolization claim, plaintiff must demonstrate that the defendant had specific intent to monopolize a relevant market and a "dangerous probability of success." Spectrum Sports Inc. v. McQuillan, 506 U.S. 447, 455 (1993). It follows that in section 2 cases a definition of the relevant market and consideration of the defendant's power within that market are required. Id. at 455-56; Walker Process, 382 U.S. at 177-78.

In this case, the alleged monopolization is over the tied product, the ink, not the tying product, the printhead technology. The patent tying cases do not create any presumption that market power over the tying product confers the degree of market power over the tied product necessary to establish a monopolization or attempted monopolization claim. See Fortner II, 429 U.S. at 619. In section 2 cases, the plaintiff bears the burden of defining the market and proving defendant's power in that market.

---

[13]     On remand, should the plaintiff prevail on liability, the district court should then assess damages. The district court then should also determine the scope of the

See <u>Spectrum Sports</u>, 506 U.S. at 455-56.  As the district court found, plaintiff makes only the conclusory allegation of a geographic market without supporting economic evidence.  <u>Indep. Ink</u>, 210 F. Supp. 2d at 1175.  Such conclusory statements are not sufficient to define a relevant market.  <u>Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.</u>, 924 F.2d 1484, 1490 (9th Cir. 1991).  Therefore, there is no genuine issue of material fact as to the section 2 claim and summary judgment was properly granted.

CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment as to the Sherman Act section 2 claim.  We reverse the district court's grant of summary judgment as to the Sherman Act section 1 claim and remand for further proceedings not inconsistent with this opinion.

<u>AFFRIMED-IN-PART, REVERSED-IN-PART, AND REMANDED</u>

COSTS

No costs.

---

tying agreement as the parties dispute whether end users as well as OEMs are bound by the tying agreement.